# EXHIBIT 2



**Debevoise & Plimpton LLP**
66 Hudson Boulevard
New York, NY 10001
+1 212 909 6000

January 13, 2026

<u>VIA ONLINE SHAREHOLDER PROPOSAL FORM</u>

U.S. Securities and Exchange Commission
Division of Corporation Finance
Office of Chief Counsel
100 F Street, N.E.
Washington, D.C. 20549

Re: <u>Chubb Limited: Omission of Shareholder Proposal Submitted by As You Sow for 2026 Annual
General Meeting</u>

Ladies and Gentlemen:

 Pursuant to Rule 14a-8(j) under the Securities Exchange Act of 1934, as amended, on behalf of
our client, Chubb Limited (the "<u>Company</u>"), we are writing to notify the Securities and Exchange
Commission (the "<u>Commission</u>") of the Company's intention to exclude a shareholder proposal (the
"<u>Proposal</u>") submitted by As You Sow (the "<u>Proponent</u>") from the proxy materials for the Company's
2026 annual general meeting of shareholders (the "<u>Proxy Materials</u>"). The full text of the Proposal,
including the supporting statement, submitted to the Company is attached hereto as <u>Exhibit A</u>.

 The Company represents that it has a reasonable basis to exclude the Proposal based on the
provisions of Rule 14a-8, prior published Commission and Staff guidance and/or judicial decisions. As
described in the Statement Regarding the Division of Corporation Finance's Role in the Exchange Act
Rule 14a-8 Process for the Current Proxy Season (Nov. 17, 2025), the Company respectfully requests that
the staff of the Division of Corporation Finance (the "<u>Staff</u>") of the Commission respond with a letter
indicating that, based on the foregoing representation, the Staff will not object to the Company's omission
of the Proposal from the Proxy Materials.

 Pursuant to Rule 14a-8(j), we (i) have filed this letter with the Commission no later than 80
calendar days before the Company intends to file its definitive Proxy Materials with the Commission; and
(ii) are simultaneously sending a copy of this letter (including the related attachments) to the Proponent as
notice of the Company's intent to omit the Proposal from the Proxy Materials. In addition, in accordance
with Rule 14a-8(k) and Staff Legal Bulletin No. 14D (Nov. 7, 2008) ("<u>SLB 14D</u>"), the Company takes
this opportunity to inform the Proponent that if the Proponent elects to submit additional correspondence
to the Commission or the Staff with respect to the Proposal, a copy of that correspondence should
concurrently be furnished to the undersigned on behalf of the Company pursuant to Rule 14a-8(k) and
SLB 14D.

 Pursuant to the guidance provided in Section F of Staff Legal Bulletin No.14F (Oct. 18, 2011),
we ask that the Staff provide its response to this request to the undersigned via e-mail at the address noted
in the last paragraph of this letter.

Securities and Exchange Commission
Office of Chief Counsel                                                    January 13, 2026

## THE PROPOSAL

The Proponent requested that the following proposal be voted on by shareholders at the Company's 2026 annual general meeting:

> **"RESOLVED:** Shareholders request that Chubb issue a third-party report assessing if and how pursuing subrogation claims for climate-related losses would benefit the Company and its insureds, omitting proprietary information, and at reasonable expense."

## BASES FOR EXCLUSION

The Company believes that the Proposal may be properly omitted from the Proxy Materials pursuant to Rule 14a-8(i)(7) because the subject matter of the Proposal relates to the Company's ordinary business operations and the Proposal impermissibly seeks to micromanage the Company.

## ANALYSIS

**The Proposal may be omitted under Rule 14a-8(i)(7) because its subject matter relates to the Company's ordinary business operations and impermissibly seeks to micromanage the Company.**

A.  *Overview of Rule 14a-8(i)(7)*

A shareholder proposal may be excluded under Rule 14a-8(i)(7) if "the proposal deals with a matter relating to the company's ordinary business operations." In Release No. 34-40018 (May 21, 1998) (the "1998 Release"), the Commission noted that the term "ordinary business" refers to matters that are not necessarily "ordinary" in the common meaning of the word; instead, the term "is rooted in the corporate law concept of providing management with flexibility in directing certain core matters involving the company's business and operations."

The Commission also noted that the principal policy for this exclusion is "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting" and identified two central considerations that underlie this policy: first, that "[c]ertain tasks are so fundamental to the management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." Second, "the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment."

When assessing proposals under Rule 14a-8(i)(7), the Staff considers the terms of the resolution and its supporting statement as a whole. See Staff Legal Bulletin No. 14C (Jun. 28, 2005) ("In determining whether the focus of these proposals is a significant social policy issue, we consider both the proposal and the supporting statement as a whole"). Framing a shareholder proposal in the form of a request for a report does not change the nature of the proposal. The Commission has stated that a proposal requesting the dissemination of a report may be excludable under Rule 14a-8(i)(7) if the subject matter of the proposed report is within the ordinary business operations of the issuer. See *Exchange Act Release No. 20091* (Aug. 16, 1983) and *Johnson Controls, Inc.* (avail. Oct. 26, 1999) ("[Where] the subject matter of

Securities and Exchange Commission
Office of Chief Counsel                                                                                    January 13, 2026

the additional disclosure sought in a particular proposal involves a matter of ordinary business … it may
be excluded under [R]ule 14a-8(i)(7).")

In Staff Legal Bulletin No. 14J (Oct. 23, 2018) ("SLB 14J"), the Staff also stated that, "consistent
with Commission guidance, [we will] consider the underlying substance of the matters addressed by the
study or report." Staff Legal Bulletin No. 14K (Oct. 16, 2019) ("SLB 14K") further provides that "[w]hen
a proposal prescribes specific actions that the company's management or the board must undertake
without affording them sufficient flexibility or discretion in addressing the complex matter presented by
the proposal, the proposal may micromanage the company to such a degree that exclusion of the proposal
would be warranted."

B.    *The Proposal Relates to the Company's Ordinary Business Operations and is Excludable*

i.        *The Company's Ordinary Business Operations*

The Proposal requests that the Company issue a third-party report assessing if and how pursuing
subrogation claims for climate-related losses would benefit the Company and its insureds. The subject
matter of the report requested by the Proposal—the pursuit of subrogation claims for climate-related
losses—relates directly to the Company's fundamental ability to manage its business as an insurance
company.

Subrogation is a legal process that allows an insurance company to recover losses of an insured
from a party that was responsible for the losses, where the losses are covered by an insurance policy.
Through subrogation, an insurance company essentially stands in the shoes of its insured to pursue
recovery from the at-fault party. Whether to assert a subrogation claim is very fact specific and depends
on what are often complex legal and business judgments, involving litigation risk, claims strategy,
underwriting policy and client relationships. Subrogation decisions, therefore, are closely bound with the
daily management of an insurer's business and implicate core decisions regarding insurance product
offerings, pricing, underwriting, litigation, claims and risk management, which decisions are impractical
and inappropriate for shareholder involvement. In short, the Proposal seeks to intrude impermissibly on
management's day-to-day operation of the Company.

It is well established that a company's decisions as to whether to offer particular products and
services and the manner in which a company offers those products and services—including, in the
Company's case and as described further below, underwriting decisions, pricing, and claims and risk
management activities which are fundamental to its insurance product offering—are precisely the kind of
fundamental, day-to-day operational matters meant to be covered by the ordinary business operations
exclusion under Rule 14a-8(i)(7). For example:

- *American International Group, Inc.* (avail. Mar. 17, 1998) (concurring in the omission of
  a proposal requesting a report assessing anticipated property and/or health care loss
  liabilities potentially caused by global warming. The Commission noted "that the
  proposal appears to focus on the Company's evaluation of risk for the purpose of setting
  insurance premiums.")

- *JPMorgan Chase & Co.* (avail. Mar. 25, 2022) (concurring in the omission of a proposal
  requesting a study on the effects of the company's underwriting practices regarding
  multi-class share offerings).

Securities and Exchange Commission
Office of Chief Counsel                                    January 13, 2026

- *JPMorgan Chase & Co. (Rice)* (avail. Feb. 21, 2019) (concurring in the omission of a proposal relating to the Company's overdraft policies and practices because it related to "the products and services offered for sale by the company").

- *American Express Company* (avail. Mar. 9, 2023) (concurring in the omission of a proposal requesting a report on the risks associated with processing payments for the sale and purchase of firearms).

- *Wells Fargo & Co.* (avail. Jan. 28, 2013) (recon. denied Mar. 4, 2013) (concurring in the omission of a proposal requesting a report "discussing the adequacy of the company's policies in addressing the social and financial impacts of direct deposit advance lending… because "the proposal relates to the products and services offered for sale by the company" and that "[p]roposals concerning the sale of particular products and services are generally excludable under rule 14a-8(i)(7)").

Consistent with the letters described above, the Proposal relates directly to the Company's ordinary business operations as an insurance company. Decisions concerning if and how to pursue subrogation claims are not ancillary or peripheral matters; rather, they are one of many interrelated components of the Company's underwriting and risk management strategy, which is informed by catastrophe modeling, scientific assessments of risk, actuarial analysis, established risk guidelines, likelihood of success, impacts on the Company's customers and lines of business, and the expertise and judgment of management.

Further, risk management is integral to the Company's global insurance operations and is embedded in its day-to-day business through a comprehensive enterprise risk management ("ERM") framework. The Company's ERM framework is led by senior management and overseen by the Company's Board of Directors (the "Board").

The Company has implemented a robust governance structure to oversee sustainability matters, including climate-related risks. At the Board level, the Nominating & Governance Committee reviews sustainability issues, including climate change, while the Risk & Finance Committee helps execute the Board's supervisory responsibilities relating to enterprise risk management, including climate risk. At the management level, the Company's Executive Committee, which includes the Chairman and Chief Executive Officer and other senior executive leaders, is responsible for aligning climate-related activities with the Company's culture, values, corporate mission and business objectives, and for executing underwriting and portfolio management decisions and responses related to climate change. In addition, management's Risk and Underwriting Committee (chaired by the Chief Risk Officer), product boards and other risk-related committees regularly review climate-related risks. The Company's Chief Risk Officer has executive responsibility for the ERM function, reporting to both the Risk & Finance Committee and the Chairman and Chief Executive Officer, and as part of the execution of the Company's enterprise risk strategies and processes monitors, with other appropriate units within the Company, legal developments relating to subrogation. The Company's Global Climate Officer provides oversight of the Company's day-to-day climate-related activities and strategies and reports to the CEO on these responsibilities.

Through this framework, the Company continually monitors natural catastrophe extreme weather events and assesses potential impacts on losses and the overall risk profile of the business. The Company uses a combination of internal data and expertise, as well as external data, modeling, and loss experience, to assess and adjust its risk exposures and risk appetite on an ongoing basis, and to incorporate those assessments into pricing, underwriting and risk management decisions. The evaluation of subrogation

4

Securities and Exchange Commission
Office of Chief Counsel                                                        January 13, 2026

strategies is embedded in these ongoing, day-to-day risk management efforts and is one of several tools the Company considers when determining whether to pursue subrogation claims and, more broadly, how best to manage and mitigate losses. These ordinary course business practices are applied to all of the Company's risk management decisions, including those related to potential exposure to natural catastrophes that may or may not be more likely or intensified due to climate change.

As noted above, a proposal requesting the dissemination of a report may be excludable under Rule 14a-8(i)(7) if the subject matter of the proposed report is within the ordinary business operations of the company. Although the Proposal on its face asks only for a report, in reality it pertains to fundamental decisions about the Company's product, underwriting and risk management decisions. The Proposal's "whereas" clause specifically describes certain ordinary business activities that the Proponent purports to be problematic, including "rate increases" and "policy non-renewals", and alleges that subrogation claims impact costs and premiums of insurance products. Notwithstanding that the Company disputes some of the Proponent's assertions about the "homeowners insurance crisis" and subrogation, the Proposal clearly and directly relates to the Company's core business. Therefore, the Proposal may be excluded under Rule 14a-8(i)(7) as relating to the Company's ordinary business operations.

ii.    *Significant Policy Issue*

In addition, we note that the Staff has previously stated that a proposal generally will not be excludable under Rule 14a-8(i)(7) where it raises a significant policy issue (Staff Legal Bulletin No. 14E (October 27, 2009) ("SLB 14E"). The fact that a proposal may touch upon a significant policy issue, however, does not preclude exclusion under Rule 14a-8(i)(7). Instead, the question is whether the proposal focuses primarily on a matter relating to the company's ordinary business operations or raises a policy issue that transcends the company's ordinary business, and whether or not the policy issue has a sufficient nexus to the company. See 1998 Release; SLB 14M; SLB 14K; SLB 14E. Further, in 2025 the Staff revised its approach to how it evaluates significant policy issues, providing that a "case-by-case" approach to evaluating significance is appropriate. See SLB 14M.

The Staff has consistently permitted the exclusion of shareholder proposals where the proposal focused on ordinary business operations matters, even though it also related to a potential significant policy issue such as climate change. For example:

- *The Goldman Sachs Group, Inc.* (avail. March 12, 2019) (proposal requesting the company adopt a policy to reduce the carbon footprint of its loan and investment portfolios in alignment with the Paris Agreement).

- *The Allstate Corporation* (avail. Apr. 11, 2025) (concurring in the omission of a proposal requesting a report disclosing how the company intends to measure, disclose and reduce the greenhouse gas emissions associated with its underwriting, insuring and investment activities in alignment with the Paris Agreement's 1.5C goal).

- *Mondelēz International, Inc.* (avail. Mar. 25, 2025) (concurring in the omission of a proposal requesting the company adopt a policy across all the forest-risk commodities to ensure independently verified deforestation, conversion and exploitation-free supply chains because the company argued that the proposal was focused on its use of particular suppliers and the policies that govern those relationships rather than a significant social policy issue, like environmental protection).

Securities and Exchange Commission
Office of Chief Counsel                                                    January 13, 2026

- *Wells Fargo & Company* (avail. Mar. 5, 2025) (concurring in the omission of a proposal requesting a report analyzing the legal and financial exposure from the company's business relationships with foreign nationals present in the U.S. illegally because the company argued that the proposal was not focused on illegal immigration and instead focused on its product and service offerings, its management of its customer relations and its related legal compliance programs).

- *Wells Fargo & Company* (avail. Mar. 5, 2025) (concurring in the omission of a proposal requesting an independent, third-party assessment of the company's respect for the internationally recognized human rights of freedom of association and collective bargaining).

- *The Kroger Co.* (avail. May 7, 2025) (concurring in the omission of a proposal requesting an audit on the impact of the company's policies and practices on the safety and well-being of workers).

Here, the Proposal requests a report "assessing if and how pursuing subrogation claims for climate-related losses would benefit the Company and its insureds". Although the report nominally relates to climate change, it is a thinly veiled attempt to influence decisions that are fundamental to the Company's day-to-day operational decisions and core business matters. As discussed above, the requested report would necessarily impact what underwriting, risk management and claims activities the Company participates in and how those activities are evaluated. Importantly, decisions about subrogation claims are inherently fact-specific and event-driven. They are made on a case-by-case basis after a particular loss has occurred and frequently involve complex, novel, and uncertain legal and factual considerations, including standing, causation, liability, jurisdictional law, and recoverability. These determinations cannot be reduced to generalized standards or assessed meaningfully in the abstract, and they require the exercise of professional judgment informed by evolving circumstances and commercial considerations—which only the Company is in a position to evaluate. Accordingly, under long-standing Commission precedent and the guidance in SLB 14M, the Proposal does not raise a policy issue that transcends the Company's ordinary business operations and is excludable under Rule 14a-8(i)(7).

C. *The Proposal Impermissibly Seeks to Micromanage the Company and is Excludable*

As described in *"Overview of Rule 14a-8(i)(7)"* above, proposals that impermissibly micromanage a company "by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment" are excludable under Rule 14a-8(i)(7). See 1998 Release. As the Commission has explained, a proposal may probe too deeply into matters of a complex nature if it "involves intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies." See 1998 Release; SLB 14J. In SLB 14J, the Staff explained that "[u]nlike the first consideration [of the ordinary business exclusion], which looks to a proposal's subject matter, the second consideration looks only to the degree to which a proposal seeks to micromanage. Thus, a proposal that may not be excludable under the first consideration may be excludable under the second if it micromanages the company."

The Staff has consistently concurred that shareholder proposals attempting to micromanage a company by providing specific details for implementing a proposal as a substitute for the judgment of management are excludable under Rule 14a-8(i)(7). For example:

- *DaVita Inc.* (avail. Apr. 22, 2025) (concurring in the exclusion on the basis of micromanagement of a proposal requesting a public report detailing and analyzing the

Securities and Exchange Commission
Office of Chief Counsel                                                                January 13, 2026

> impact of racial and ethnic disparities in healthcare outcomes on the company's
> business).

- *State Street Corporation* (avail. Mar. 26, 2021) (concurring in the exclusion on the basis of micromanagement of a proposal requesting a report as to how the company's voting and engagement policies affect the majority of its clients and shareholders).

- *JP Morgan Chase & Co.* (avail. Mar. 30, 2018) (concurring in the exclusion on the basis of micromanagement of a proposal requesting a report on the reputational, financial and climate risks associated with project and corporate lending, underwriting, advising and investing of tar sands projects).

Further, in SLB 14K, the Staff clarified that "a proposal, regardless of its precatory nature, that prescribes specific timeframes or methods for implementing complex policies . . . may be viewed as micromanaging the company." Moreover, "the precatory nature of a proposal does not bear on the degree to which a proposal micromanages." Instead, the Staff assesses the "level of prescriptiveness of the proposal," and "if the method or strategy for implementing the action requested by the proposal is overly prescriptive, thereby potentially limiting the judgment and discretion of the board and management, the proposal may be viewed as micromanaging the company."

The Proposal seeks to micromanage the Company because it mandates specific actions outside of the Company's ERM framework, which is described in Section B(i) above, and improperly interferes with the discretion of the Board and management to make informed judgments regarding the conduct of the Company's business. As noted above, decisions regarding whether and how to pursue subrogation claims necessarily implicate core operational matters, including insurance product offerings, pricing, underwriting, litigation, and claims and risk management. These decisions are informed by catastrophe modeling, scientific assessments of risk, actuarial analysis, established risk guidelines, likelihood of success, the resulting impact on the Company's customers and lines of business, and the expertise and judgment of management.

The Proposal requests the preparation of a third-party report that would require the Company to prospectively assess subrogation claims. Such an assessment would depart from and be antithetical to the manner in which the Company evaluates and manages a complex and fact-specific component of its insurance operations. In doing so, the Proposal is overly prescriptive, unduly burdensome and impractical given the inherently individualized and retrospective nature of subrogation claims assessment.

Moreover, by mandating the preparation of a third-party report, the Proposal would override the Board's and management's discretion to determine whether commissioning such a report is an appropriate or effective means of evaluating the Company's subrogation strategy. In management's and the Board's judgment, no third party possesses the same depth of expertise regarding the cost-benefit analysis of subrogation for the Company's insurance portfolio as the Company itself. Requiring the Company to outsource such analysis would impose unnecessary costs and would require the disclosure of competitively sensitive and proprietary information relating to the Company's underwriting, subrogation and litigation strategies. In addition, a report focused on a single mechanism for addressing climate-related losses would fail to account for the broader and interdependent considerations informing the Company's underwriting, pricing, capital allocation and enterprise risk management decisions.

Decisions regarding subrogation claims involve highly technical and nuanced judgments that are not amenable to shareholder oversight as a practical matter. Rather, such decisions fall squarely within the purview of the Board and management, who possess the expertise necessary to evaluate these matters in

Securities and Exchange Commission
Office of Chief Counsel                                    January 13, 2026

light of the Company's overall business strategy and risk profile. Because the Proposal seeks to dictate specific operational decisions and processes, it impermissibly intrudes upon ordinary business matters and may be excluded under Rule 14a-8(i)(7).

**CONCLUSION**

For the foregoing reasons, the Company respectfully requests that the Staff respond with a letter indicating that, based on the Company's representation, the Staff will not object to the Company's omission of the Proposal from the Proxy Materials.

If you have any questions regarding this letter or require any additional materials, please do not hesitate to contact me at etjuergens@debevoise.com or Matthew E. Kaplan at mekaplan@debevoise.com.

Sincerely,

Eric T. Juergens

cc:  Matthew E. Kaplan, Debevoise & Plimpton LLP
     Gina Rebollar, Chief Corporate Lawyer and Deputy General Counsel, Global Corporate Affairs, Chubb
     Mary Zuccarello, Climate and Energy Sr. Associate, As You Sow

Enclosures
     Exhibit A: The Proposal and Related Supporting Statement