**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AS YOU SOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:26-cv-00734 (SLS) |
| | ) | |
| CHUBB LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

**CHUBB LIMITED'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO DISMISS AND IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Jonathan K. Youngwood (Bar No. NY0424)
Laura K. Lin (*pro hac vice forthcoming*)
Simpson Thacher & Bartlett LLP
New York, NY 10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: jyoungwood@stblaw.com

Allen W. Burton (*pro hac vice* motion forthcoming)
Allessandra Rose Johnson (*pro hac vice* motion forthcoming)
Elizabeth Marley (*pro hac vice* motion forthcoming)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Phone: (212) 326-2000
Fax: (212) 326-2061
Email: aburton@omm.com

*Counsel for Defendant*

March 19, 2026

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................................... 1

**STATEMENT OF FACTS** ...................................................................................................... 4

    A.   Regulatory Framework Governing Shareholder Proxy Proposals ..................................... 4

    B.   Plaintiff AYS .................................................................................................................. 6

    C.   Chubb Ltd.'s Global Insurance Business ........................................................................ 7

    D.   As an Insurer, Chubb's Business Requires It to Assess, Assume, and Manage Many Kinds of Risk ........................................................................................................................... 8

    E.   Subrogation is a Litigation Tool Analyzed Daily by Chubb and Used Whenever It Makes Legal and Business Sense in Management's Judgement ...................................................... 8

    F.   Rate-Setting Is a Core Function of Chubb's Business ..................................................... 10

    G.   Chubb's Risk Management Assess a Wide Variety of Risks ........................................... 10

    H.   AYS's Latest Shareholder Proposal ...............................................................................11

    I.   Chubb Ltd. Determines AYS's Proposal Should Be Excluded From Its Proxy ............... 12

    J.   Procedural Posture & Service of Process........................................................................ 12

    K.   Plaintiff Improperly Attempts Service Through a US Subsidiary ................................... 14

**ARGUMENT** ......................................................................................................................... 15

**I.**      **Service Was Improper and, Thus, This Court Lacks Jurisdiction Over Chubb Ltd.** ................................................................................................................................. 15

    A.   Plaintiff Has Not Complied with Hague Convention Requirements ............................... 16

    B.   Chubb Ltd.'s Registration Statement Authorization Does Not Apply. ............................ 18

**II.**    **Laches Applies as a Result of AYS's Three-Month Delay and Bars Relief Here. .. 20**

**III.**   **AYS Cannot Meet Its Burden to Justify the "Extraordinary Remedy" of An Affirmative Preliminary Injunction and Dismissal is Appropriate for the Same Reasons as a Matter of Law.** .............................................................................. 23

    A.   AYS Has Not Shown a Substantial Likelihood, Let Alone Clear Likelihood, of Success on the Merits—and Cannot Prevail on the Merits as a Matter of Law—for Two Independent Reasons ..................................................................................................... 24

       1.   AYS Lacks a Private Right of Action ........................................................................ 25

       2.   AYS's Proposal Is Properly Excluded Under the Ordinary Business Exclusion in SEC Rule 14a-8(i)(7) ....................................................................................................... 26

3.    AYS's Proposal Is Independently Excludable Because It Impermissibly Micromanages Complex Operational Decisions ................................................................. 35

B.    The Remaining Preliminary Injunction Factors Favor Chubb Ltd. and Require Denial of AYS's Requested Relief. ......................................................................................... 39

1.    AYS Will Not Suffer Irreparable Harm .......................................................... 40

2.    The Balance of the Equities Weighs in Chubb Ltd.'s Favor. ......................... 42

3.    An Injunction Would Not Serve the Public Interest. ..................................... 44

**IV.    If an Injunction is Imposed, AYS Should Be Required to Post a Bond. ................. 44**

**CONCLUSION ........................................................................................................... 45**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

\* *Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................................................. 25

\* *Apache Corp. v. N.Y.C. Emps.' Ret. Sys.*,
    621 F. Supp. 2d 444 (S.D. Tex. 2008) ...................................................... 35, 36, 37

\* *Roosevelt v. E.I. Du Pont de Nemours & Co.*,
    958 F.2d 416 (D.C. Cir. 1992) ............................................................. 25, 27, 32, 33

\* *Save Long Beach Island, Inc. v. U.S. Dep't of Com.*,
    2025 WL 2996157 (D.D.C. Oct. 24, 2025) ...................................................... 21, 41

\* *Tosdal v. NorthWestern Corp.*,
    440 F. Supp. 3d 1186 (D. Mont. 2020) ...................................................... passim

\* *Trinity Wall St. v. Wal-Mart Stores, Inc.*,
    792 F.3d 323 (3d. Cir 2015) ........................................................................... passim

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ............................................................................ 25

*Amarasinghe v. Quinn*,
    148 F. Supp. 2d 630 (E.D. Va. 2001) .................................................................... 40

*Apotex, Inc. v. Food & Drug Admin.*,
    449 F.3d 1249 (D.C. Cir. 2006) ............................................................................ 25

*Bastani v. Am. Fed'n of Gov't Emps., AFL-CIO*,
    2022 WL 2156998 (D.D.C. June 14, 2022) .......................................................... 18

*Bell Atl. Corp v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................. 24

*Billington v. Hayduk*,
    439 F. Supp. 971 (S.D.N.Y. 1977) ....................................................................... 40

*Boustead Secs., LLC v. Leaping Grp. Co.*,
    2020 WL 6263754 (S.D.N.Y. Oct. 22, 2020) ....................................................... 18

*Clevinger v. Advoc. Holdings, Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025) ........................................................................... 39

*Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*,
    795 F. Supp. 3d 7 (D.D.C. 2025) ........................................................................ 42

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) .................................................................... 42, 43

*Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi, Ltd.*,
    15 F. Supp. 2d 1 (D.D.C. 1997), *aff'd* 159 F.3d 636 (D.C. Cir. 1998) .................. 23

*Cruz-Packer v. Dist. of Columbia*,
    539 F. Supp. 2d 181 (D.D.C. 2008) .................................................................. 16

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) ........................................................................ 44

*Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*,
    243 F. Supp. 3d 141 (D.D.C. 2017) .................................................................. 23

*Fox TV Stations, Inc. v. FilmOn X LLC*,
    966 F. Supp. 2d 30 (D.D.C. 2013) .................................................................... 45

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) ........................................................................ 41

*Gardner v. Erie Ins.*,
    639 F. Supp. 3d 135 (D.D.C. 2022) .................................................................. 21

*Gentry v. Chubb*,
    2022 WL 1082453 (D.N.J. Apr. 11, 2022) ........................................................ 17

*GR OPCO, LLC v. Chubb Ltd.*,
    2021 WL 7500321 (S.D. Fla. Jan. 27, 2021) .................................................... 17

*Haliday v. Haliday*,
    11 F.2d 565 (D.C. 1926) ................................................................................ 21

*Hall v. Tyco Int'l Ltd.*,
    223 F.R.D. 219 (M.D.N.C. July 27, 2004) ........................................................ 23

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ...................................................................................... 25

*Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*,
    402 F.3d 1249 (D.C. Cir. 2005) ...................................................................... 16

*Jouanny v. Embassy of France in the U.S.*,
    220 F. Supp. 3d 34 (D.D.C. 2016) .................................................................. 15

*Mahan v. Tash*,
   703 F. Supp. 130 (D.D.C. 1989) ........................................................................... 21

*Mann v. Castiel*,
   681 F.3d 368 (D.C. Cir. 2012) ............................................................................... 15

*Med. Comm. for Hum. Rts. v. SEC*,
   139 U.S. App. D.C. 226, 432 F.2d 659 (D.C. Cir. 1970) ........................................ 32

*Menominee Indian Tribe of Wis. v. United States*,
   614 F.3d 519 (D.C. Cir. 2010) ............................................................................... 20

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
   526 U.S. 344 (1999) ............................................................................................... 15

*Myland Pharms., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................... 41

*N.Y.C. Emps. Retirement Sys. v. Am. Brands, Inc.*,
   634 F. Supp. 1382 (S.D.N.Y. 1986) ....................................................................... 40

*NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*,
   753 F.2d 131 (D.C. Cir. 1985) ............................................................................... 20

*Nat'l Ass'n of Mfrs. v. Taylor*,
   549 F. Supp. 2d 68 (D.D.C. 2008) ......................................................................... 44

*Nat'l Conf. on Ministry to the Armed Forces v. James*,
   278 F. Supp. 2d 37 (D.D.C. 2003) ......................................................................... 23

*Nat'l Kidney Patients Ass'n v. Sullivan*,
   958 F.2d 1127 (D.D.C. 1992) ................................................................................. 45

*Nat'l Treasury Emps. Union v. Trump*,
   2025 WL 1441563 (D.C. Cir. May 16, 2025) ................................................... 3, 45

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
   484 U.S. 97 (1987) ................................................................................................. 15

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
   48 F. Supp. 3d 87 (D.D.C. 2014) ........................................................................... 39

*Saleh v. Al Nahyan*,
   2021 WL 7210780 (D.D.C. July 16, 2021) ............................................................ 15

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ............................................................................................... 20

*Schwarz v. Thomas*,
222 F.2d 305 (D.C. Cir. 1955)..................................................................................... 20

*Scientific Holding Co. v. Plessey, Inc.*,
510 F.2d 15 (2d Cir. 1974) .......................................................................................... 19

*SEC v. Med. Comm. for Hum. Rts.*,
404 U.S. 403 (1972)...................................................................................................... 32

*Simpkins v. D.C. Gov't*,
108 F.3d 366 (D.C. Cir. 1997)...................................................................................... 15

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...................................................................................................... 30

*Stallard v. Goldman Sachs Grp., Inc.*,
2022 WL 59395 (Jan. 6, 2022 D.D.C.) ....................................................................... 20

*Standing Rock Sioux Tribe v. U.S. Army Corp of Eng'rs*,
239 F. Supp. 3d 77 (D.D.C. 2017) ............................................................................... 20

*Team Rubicon Glob. Ltd. v. Team Rubicon, Inc.*,
2020 WL 3127877 (S.D.N.Y. June 12, 2020) ............................................................. 45

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
486 U.S. 694 (1988)...................................................................................................... 16

*Watch Tower Bible & Tract Soc'y of Pa. v. Russian Fed'n*,
804 F. Supp. 3d 153 (D.D.C. 2025) ....................................................................... 16, 17

*Wilson v. Prudential Fin.*,
332 F. Supp. 2d 83 (D.D.C. 2004) ............................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................................... 20, 23

**Statutes**

15 U.S.C. § 78(n) ....................................................................................................... 4, 25

Rule 14a-8(i)(10) .............................................................................................................. 24

**Treaties**

Convention on Service Abroad of Judicial and Extrajudicial Documents in
Civil and Commercial Matters, 1969 20 U.S.T. 361 (1965).................................. 13, 16

**Federal Rules and Regulations**

17 C.F.R. § 240.14a-8 ................................................................................................ passim

Fed. R. Civ. P. 4(f) ................................................................................................................ 16

Fed. R. Civ. P. 65 .................................................................................................................. 45

Fed. R. Evid. 201 .................................................................................................................. 22

SEC, Adoption of Amendments Relating to Proposals by Security Holders,
    Exchange Act Release No. 34-12999, 41 Fed. Reg. 52,994 (Dec. 3,
    1976) ........................................................................................................................... 4, 22

SEC, *Amendments to Rules on Shareholder Proposals*, Release No. 34-
    40018, 63 Fed. Reg. 29,106, 29,108 ................................................................... passim

SEC, *Procedural Requirements and Resubmission Thresholds Under
    Exchange Act Rule 14a-8,* Exchange Act Release No. 89964, 85 Fed.
    Reg. 70,240, 70,240 (Nov. 4, 2020), available
    at https://www.sec.gov/rules/final/2020/34-89964.pdf ....................................... 4, 42

**SEC No-Action Letters**

*Allstate Corp.*,
    2025 WL 1423264 (Apr. 11, 2025) ............................................................................... 39

*Amazon.com, Inc.*,
    2025 WL 1423242 (Apr. 4, 2025) ................................................................................. 39

*Hartford Ins. Grp.*,
    2025 WL 1381730 (Apr. 3, 2025) ................................................................................. 39

*MetLife, Inc.*,
    2023 WL 4251417 (Apr. 24, 2023) ............................................................................... 39

*Targa Res. Corp.*,
    2025 WL 1381725 (Mar. 27, 2025) .............................................................................. 39

**Secondary Authorities**

* SEC Staff Legal Bulletin No. 14M (Feb. 12, 2025) ............................................... passim

1998 Adopting Release, 1998 WL 254809 ....................................................................... 33

Advisory Committee Notes to 1993 Amendment to Rule 4(f) ...................................... 17

Chubb Limited Form S-3 Registration Statement (Oct. 3, 2024) ................................... 14, 15, 18

Chubb Limited Form S-3 Registration Statement (Oct. 9, 2018) ................................................ 14

Chubb Limited Prospectus Supplement (Aug. 4, 2025) ............................................................. 18

Commissioner Mark T. Uyeda, SEC, Remarks at the Society for Corporate
    Governance 2023 National Conference (June 21, 2023) .......................................................... 4

SEC Staff Legal Bulletin No. 14J (Oct. 23, 2018).................................................................. 35, 39

SEC Staff Legal Bulletin No. 14K (Oct. 16, 2019) ...................................................... 36, 38, 39, 40

SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021) .................................................................. 31, 32

SEC Statement Regarding the Division of Corporation Finance's Role in
    the Exchange Act Rule 14a-8 Process for the Current Proxy Season
    (November 17, 2025) ................................................................................................................ 5

SEC, Commissioner Elad L. Roisman, *Statement on Procedural
    Requirements and Resubmission Thresholds under Exchange Act Rule
    14a-8* (Sept. 23, 2020) ......................................................................................................... 40

Switzerland's Central Authority & Practical Information, retrieved from
    the Hague Conference on Private International Law on March 17,
    2026......................................................................................................................................... 13

U.S. Embassy for Switzerland and Liechtenstein Service Process............................................. 13

**INTRODUCTION**

This case is before the Court on an expedited basis due to a manufactured emergency. Despite knowing since January 13, 2026 that Defendant Chubb Limited ("Chubb Ltd.") intended to exclude its shareholder proposal, Plaintiff As You Sow ("AYS") waited until the last possible moment to file suit and seek a preliminary injunction regarding the distribution of Chubb Ltd.'s annual meeting materials. AYS demands that the Court should order, within a matter of days, Chubb Ltd. to include AYS's objectionable proposal in its proxy materials. If that happens, the associated costs and distraction, to both Chubb Ltd. and all of its shareholders, will be permanent and affirmative, not preliminary.

The Court should deny AYS's extraordinary request and dismiss AYS's Complaint for three independent reasons. *First*, AYS failed to properly serve Chubb Ltd., a Swiss company with its principal place of business in Zurich, rendering the Court without jurisdiction over Chubb Ltd. and requiring dismissal pursuant to Rule 12(b)(5). This jurisdictional defect is glaring and dispositive. While the false exigency created by AYS's tardy filing has forced the jurisdictional and merits arguments into the same proceeding, that joinder of issues provides no excuse for AYS's failure to properly serve Chubb Ltd. The Court should dismiss the claim for lack of jurisdiction and, in doing so, need not reach the merits.

*Second*, even if AYS properly served Chubb Ltd, which it has not, AYS's two months delay inequitably forced this matter into a rushed proceeding, triggering the doctrine of laches. AYS is both sophisticated and experienced in shareholder advocacy, having submitted hundreds of proposals over the past fifteen plus years to dozens of different corporations, including several to Chubb Ltd. It had no excuse for the delay.

*Third*, AYS's arguments fail on the substance for multiple, independent reasons requiring dismissal of the Complaint as a matter of law pursuant to Rule 12(b)(6) and denial of the

1

preliminary injunction.  SEC Exchange Act Rule 14a-8 permits exclusion of shareholder proposals on numerous grounds, including that a proposal "deals with a matter relating to the company's ordinary business operations."  17 C.F.R. § 240.14a-8(i)(7) (hereafter, "Rule 14a-8(i)(7)").  The SEC interprets this exclusion as encompassing two independent grounds for exclusion:  the *subject matter* of the proposal impermissibly concerns the company's ordinary course of business, or the proposal calls for *micromanaging* the mechanics of how the company performs its business.  SEC, Shareholder Proposals: Staff Legal Bulletin No. 14M (CF) (Feb. 12, 2025)  (hereinafter, "SEC Legal Bulletin No. 14M").  Proposals purporting to involve matters of public policy—like climate change—are not immune from these exclusions.  Rather, the SEC's rules permit exclusion unless a policy-focused proposal, as applied to an individual company's particular business operations, transcends the day-to-day business matters of that individual company.  *Id.*

AYS's proposal cannot meet the transcendence test, and in fact, seeks to micromanage the company's everyday business operation of selling insurance and paying claims. AYS's proposal zeroes in on "subrogation" a specific legal tool employed by insurers on a case-by-case basis to recoup exposure to an individual loss from a responsible third party through litigation.  When and how to pursue subrogation is technical, complex, and fact specific.  Indeed, Chubb designed an entire proprietary model to analyze this question and relies on a team of in-house specialists, and outside legal counsel, to make subrogation decisions on a daily basis.  Particularly in the context of Chubb's distinct business operations as an insurance company, AYS's proposal is an axiomatic example of in-the-weeds interference with daily operations.  *See Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 342 (3d. Cir 2015) (applying the SEC's ordinary course exception to uphold Walmart's exclusion of a shareholder proposal seeking review of the company's sale of firearms); *see also Tosdal v. NorthWestern Corp.*, 440 F. Supp. 3d 1186, 1200 (D. Mont. 2020)

(same, finding interference with daily operation of a defendant energy company's business from a shareholder proposal seeking a report on a transition from coal fired power to renewable energy).

Nor can AYS support the remaining preliminary injunction factors. AYS cannot show it faces any harm, let alone irreparable harm, because it has no lawful right to have its proposal included in Chubb Ltd.'s proxy materials in the first place. AYS fails to show any cognizable harm arising from a delay in presenting its subrogation report request to Chubb shareholders, even if it were entitled to do so, which it is not. AYS creates new climate-related proxy questions every year, demanding that companies produce reports about an evolving list of questions. AYS can make no showing that a report about subrogation is so urgent that AYS will suffer irreparable harm if the proposal now in dispute is not placed this year's proxy. As AYS admits, it submits proxy questions not as an urgent matter of corporate policy, but as tactic of climate advocacy. Nothing prevents AYC from pursuing those advocacy climate advocacy activities through other avenues.

The balance of the equities also favors Chubb Ltd., given the specific and significant harms to Chubb Ltd. if it is forced to undergo the effort and expense of including AYS's proposal. AYS's public interest argument likewise fails, given that the public interest is defined by the lawmakers and regulators who imposed limits on shareholder proposals that undermine the judgment of management. AYS's attempt to usurp those limits runs contrary to the public interest.

*Finally*, Chubb Ltd. requests this Court order a bond to protect Chubb from the harm an errant injunction will cause. *See Nat'l Treasury Emps. Union v. Trump*, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) ("injunction bonds are generally required" in preliminary injunction proceedings) (per curiam), *reconsideration en banc denied* (July 16, 2025).

## STATEMENT OF FACTS

### A.    Regulatory Framework Governing Shareholder Proxy Proposals

Public company shareholders are permitted to submit proposals for inclusion in a public company's proxy statements for consideration by other shareholders—subject to procedural and substantive limitations.  *See* 15 U.S.C. § 78n (empowering SEC to regulate the proxy process and public companies' solicitation of proxy proposals from shareholders); 17 C.F.R. § 240.14a-8.

These SEC imposed limits recognize that shareholder proposals that "exceed[] the bounds of reasonableness" come "at the expense of other shareholders."[1]  "[T]he costs of processing, analyzing, and voting on the proponent's proposal largely are borne by the company and its shareholders" as a whole.[2]  The SEC estimates these costs amount to $150,000 per proposal.  *Id.* The cost is substantive, too, because improper proposals "tend to obscure other material matters in the proxy statements of issuers, thereby reducing the effectiveness of such documents," *see* SEC Release No. 12999, and impose "opportunity costs associated with the board's and management's time that could have been spent on value-creating activities for the company."[3]

The limitations at issue here are substantive and found in SEC Rule 14a-8(i)(7).  This rule permits a company to exclude a shareholder proposal "[i]f the proposal deals with a matter relating to the company's ordinary business operations."  17 C.F.R. § 240.14a-8(i)(7).

---

[1]    *See* SEC, Adoption of Amendments Relating to Proposals by Security Holders, Exchange Act Release No. 34-12999, 41 Fed. Reg. 52,994 (Dec. 3, 1976) ("SEC Release No. 12999").

[2]    SEC, *Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8,* Exchange Act Release No. 89964, 85 Fed. Reg. 70,240, 70,240 (Nov. 4, 2020), available at https://www.sec.gov/rules/final/2020/34-89964.pdf ("SEC 2020 Release").

[3]    Commissioner Mark T. Uyeda, SEC, Remarks at the Society for Corporate Governance 2023 National Conference (June 21, 2023), available at https://www.sec.gov/newsroom/speeches-statements/uyeda-remarks-society-corporate-governance-conference-062123.

According to the SEC, the "principal consideration" driving Rule 14a-8(i)(7) is "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting."  SEC, *Amendments to Rules on Shareholder Proposals*, Release No. 34-40018, 63 Fed. Reg. 29,106 (May 28, 1998) (hereafter, "SEC, Release No. 34-40018").  The SEC has interpreted Rule 14a-8(i)(7) to contain two distinct exclusions, either of which can justify exclusion of a shareholder proposal:[4]

1. **"Ordinary Business Exclusion"**:  The subject matter related to certain tasks that are "fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight" (the "Ordinary Course Exclusion") or

2. **"Micromanagement Exclusion"**:  "The proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders . . . would not be in a position to make an informed judgment." *Id.*  In this context, the SEC clarified that "ordinary" is a term of art "rooted in the corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations."

*Id.* at 29,107.

To help explain these exclusions (and others), the SEC's Division of Corporation Finance regularly publishes legal bulletins providing guidance on how Division staff interpret the Rules. While not legally binding, the Bulletin reflects "the [SEC] staff's views regarding various aspects of the federal securities laws and SEC regulations."  SEC, Staff Legal Bulletins, available at https://www.sec.gov/rules-regulations/staff-guidance/staff-legal-bulletins.  The most recent Staff Legal Bulletin of February 25, 2025, represents the SEC staff's most current position statement on the shareholder proposal rules.  SEC Legal Bulletin No. 14M.

---

[4]    The SEC also permits companies to exclude shareholder proposals that call for action already substantially implemented by a company.  *See* Rule 14a-8(i)(10).

The SEC staff recently changed the process for evaluating shareholder proposals, pausing the "no- action" process.[5]  On November 17, 2025, the SEC's Division of Corporation Finance announced that, given the "extensive body of guidance from the Commission and the staff available to both companies and proponents" it would not review no-action requests to exclude shareholder proposals under Rule 14a-8, with the exception of exclusions under Rule 14a-8(i)(1). *Id.*  Companies are still obligated to notify the SEC staff of its intent to exclude a proposal, but the SEC staff will not substantively respond to these notices.  *Id.*  Instead, the SEC staff now provides "no objection" letters to companies.  *Id.*

**B.      Plaintiff AYS**

AYS is a self-proclaimed "nation[al] non-profit leader in shareholder advocacy," focused on environmental and social corporate responsibility.  *See* Declaration of Laura Lin ("Lin Decl.") Ex. A. Since 2010, AYS has submitted at least 880 shareholder proxy proposals to dozens of different public companies and AYS reports on these proposals via its own online tracker.  *Id.*

AYS's own website reflects that AYS has had 70 of its shareholder proposals blocked by the recipient company, and another 370 have been withdrawn by AYS.  *Id.*

Each year since 2022, AYS has submitted a shareholder proposal to Chubb Ltd.  *Id.*  In each of those years(including this one), Chubb Ltd. engaged substantively with AYS.  Indeed, Chubb Ltd. has published and circulated all prior proposals from AYS except for one, which repeatedly referred to Allstate instead of Chubb and which AYS voluntarily withdrew.  AYS's prior proposals to Chubb Ltd. also related to climate initiatives but on a different topic, seeking

---

[5]      *See* SEC Statement Regarding the Division of Corporation Finance's Role in the Exchange Act Rule 14a-8 Process for the Current Proxy Season (November 17, 2025), available at https://www.sec.gov/newsroom/speeches-statements/statement-regarding-division-corporation-finances-role-exchange-act-rule-14a-8-process-current-proxy-season.

6

reporting from Chubb Ltd. on greenhouse gas emissions, beyond what Chubb Ltd. already reports, and progress toward the Paris Climate Accord.  *Id.*

All but the first of AYS's annual proposals to Chubb Ltd. were rejected by shareholders, with AYS's most recent proposal submitted to Chubb Ltd. shareholders receiving only 13.9% of the vote.  *Id.*  As a result of last year's 13.9% shareholder vote, a substantially similar proposal on GHG emissions by AYS would have been barred from inclusion in Chubb Ltd.'s proxy materials this year, which would have effectively prevented AYS from getting such a proposal in front of shareholders.  *See* 17 C.F.R. § 240.14(a)-8(i)(12)(iii).  This year, Chubb Ltd. rejected AYS's new proposal on the separate topic of subrogation.

### C.        Chubb Ltd.'s Global Insurance Business

Chubb Ltd. is a holding company organized under the laws of Switzerland with its principal place of business in Zurich, Switzerland and a global leading in insurance.  Declaration of Samantha Froud ("Froud Decl.") ¶ 5.  Chubb Ltd. is a publicly traded company listed on the New York Stock Exchange and registered with the SEC.  Companies held by Chubb Ltd. engage in the actual business of providing commercial, personal property, and casualty insurance, as well as other types of insurance to a diverse group of clients. [6]  *Id.*

As a publicly traded company, Chubb Ltd. has dual responsibility to its shareholders and to the policyholder of the Chubb Companies.  Both groups are best served when Chubb Ltd.'s fundamental underwriting business engages in the proper underwriting of risk, makes smart decisions on coverage and pricing offerings, and pays claims fairly and promptly.

---

[6]        Subsidiaries held by Chubb Ltd. engage in the actual business of providing insurance. These subsidiary companies are referred to herein as the "Chubb Companies" or "Chubb" and are distinct from Chubb Ltd., the Swiss-incorporated parent.

D.      **As an Insurer, Chubb's Business Requires It to Assess, Assume, and Manage Many Kinds of Risk**

Risk management is integral to the Chubb Companies' global insurance operations and is embedded in its day-to-day business through a comprehensive risk management framework. Declaration of Frances D. O'Brien ("O'Brien Decl.") ¶ 4.  Overall management of risk at Chubb includes a wide variety of business processes and functions including core risk management functions, assessment and integration of emerging risks into Chubb's underwriting risk portfolio, and strategic decision making in claims processing including whether and when to engage in any form of claims litigation (including subrogation).  Appropriate management of these risks is essential to fulfilling Chubb's core obligations to its individual policyholders and its shareholders.

Chubb's risk management framework is forward thinking, integrally linked to key business objectives, and designed to ensure sufficient financial strength over the long term to pay claims while simultaneously building and sustaining shareholder value.  Chubb's C-suite includes a Chief Risk Officer.  O'Brien Decl. ¶ 1.

E.      **Subrogation is a Litigation Tool Analyzed Daily by Chubb and Used Whenever It Makes Legal and Business Sense in Management's Judgement**

Subrogation is a core tool Chubb uses to manage risk.  O'Brien Decl. ¶ 7. Subrogation is a legal doctrine that allows an insurance company to recover losses from a party that was responsible for the losses.  Declaration of Joseph Mannion ("Mannion Decl.") ¶ 4.  Such losses must have been (i) incurred by an insured individual, (ii) covered by an insurance policy, and (iii) paid out by the insurer.  *Id.*  Through subrogation, an insurance company essentially stands in the shoes of its insured to pursue recovery from an at-fault party after a loss event has occurred.  *Id.*

Subrogation is analyzed and used in Chubb's day-to-day business because it allows insurers to reallocate certain losses onto directly responsible third parties.  Mannion Decl. ¶ 5.  To increase efficiency and economic return in handling subrogation decision making, Chubb

8

developed a comprehensive Subrogation Framework that it uses, in consultation with outside counsel, to assess, investigate, and manage subrogation claims.  Mannion Decl. ¶ 11.  The Subrogation Framework processes claims through a proprietary system designed to assess the subrogation potential of each claim individually, based on factors relevant to the strength of that claim.  *Id.*  Chubb then has professionals investigate claims assessed to have a high subrogation potential to decide the viability of subrogation and risks associated with it.  *Id.*

Chubb claims professionals actively consider all available approaches to subrogation. Mannion Decl. ¶ 12.  The nature of subrogation means that the analysis and decision of whether to pursue it must be made after a loss has occurred and at the level of the individual claim.  *Id*. ¶ 6. Making subrogation decisions requires the exercise of professional judgment informed by evolving circumstances and commercial considerations on a claim-by-claim basis.  *Id*. ¶¶ 6, 7, 10.

Evaluating the potential for subrogation recovery is a highly fact-specific inquiry involving a variety of factors.  Mannion Decl. ¶ 8.  For example, some claims may have a clear third-party bearing responsibility, but that third party lacks recoverable assets, resulting in greater forecasted litigation expenses than potential recovery.  *Id.*  Other claims may appear to have a third-party bearing responsibility, but the transactional costs of arguing and proving its responsibility make pursuit of the recovery economically infeasible.  *Id.*  Often, subrogation decisions involve complex and uncertain legal and factual considerations, including standing, causation, liability, and jurisdictional law in addition to cost and recoverability consideration.  *Id.*  Beyond individual litigation decisions, a variety of reputational, operational, and other business considerations may also alter the decision-making calculus for assessing subrogation claims.  *Id.*

### F.    Rate-Setting Is a Core Function of Chubb's Business

Setting rates is also a key and ordinary business function for Chubb, as it is for any insurance company.  Declaration of Peter Attanasio ("Attanasio Decl.") ¶ 3.  Rate-setting is a foundational step for how Chubb assesses risk in the insurance policies it issues.  *Id.*

Chubb sets rates by analyzing "historical loss costs" (meaning, data about Chubb's past claims experiences) and trending those loss costs to the period being rated.  *Id.* at ¶ 6.  Chubb's historical loss costs include: (i) actual claim loss payments, (ii) subrogation recoveries, (iii) litigation expenses, and (iv) modeling assumptions.  *Id.*  Alongside historical loss costs, Chubb also accounts for inherent or foreseeable risks in a given location (such as natural disasters or "catastrophic events") or for a particular industry.  *Id.*  Altogether, these inputs generate rating factors and modifiers for Chubb's actuaries, who create detailed actuarial analyses to inform the rates that Chubb ultimately establishes.  *Id.*  Past subrogation outcomes are already incorporated directly into Chubb's rate-setting practices because they are part of Chubb's historical loss experience, the basis on which rates are calculated.  *Id.* at ¶ 9.  Chubb must account for global events and natural catastrophes, federal and state regulations, inflationary challenges, and on an individual claims level, costs of litigation and related expenses.

### G.    Chubb's Risk Management Assess a Wide Variety of Risks

Risk management is integral to Chubb's global insurance operations and is embedded in its day-to-day business through a comprehensive risk management framework.  O'Brien Decl. ¶ 4. Overall management of risk at Chubb Ltd. includes a wide variety of business processes and functions including core risk management functions, assessment and integration of emerging risks into Chubb Ltd.'s underwriting  risk portfolio,  and  strategic  decision  making  in  claims processing including whether and when to engage in any form of claims litigation (including

subrogation). *Id.* at ¶¶ 8–9. Appropriate management of these risks is essential to fulfilling Chubb Ltd.'s core obligations to its individual policyholders and its shareholders. *Id.* at ¶¶ 8–9, 11.

Among the many forms of risk that Chubb manages is risk related to climate change. These risks are addressed through the same disciplined risk assessment processes applied to all other risks. *Id.* at ¶ 9. Chubb Ltd. transparently reports on material climate and sustainability topics as part of its regular public filings, in particular its annual Sustainability Report (and its predecessor report, the Climate Related Financial Disclosure), which is broadly aligned with the International Sustainability Standards Board (ISSB) S-1 and S-2 Standards and satisfies Chubb Ltd.'s reporting requirements under Swiss law and the National Association of Insurance Commissioners Climate Risk Disclosure Survey. *Id.* The Sustainability Report includes discussion of Chubb Ltd.'s climate strategy, transition plan, and climate-related metrics, and consideration of how climate change may impact a broad range of Chubb Ltd.'s ordinary course business activities. All of Chubb Ltd.'s climate reporting is publicly available on its website. *Id.*

Chubb management has determined that interference with management's decisions about how to assess and manage climate risk, including through the use of tools like subrogation, would threaten the company's ordinary course risk management processes and could impose added costs on shareholders and policyholders. *Id.* at ¶ 10.

### H.    AYS's Latest Shareholder Proposal

On November 26, 2025, AYS mailed its most recent shareholder proposal to Chubb Ltd.'s Zurich, Switzerland headquarters. R.1 (Compl.) Ex. 1. Unlike AYS's prior shareholder proposals submitted annually to Chubb Ltd. since 2022, this proposal did not seek reporting on greenhouse gas emissions resulting from Chubb Ltd.'s operations. AYS proposed, instead, a new focus on subrogation:

11

**Resolved**: Shareholders request that Chubb issue a third-party report assessing if and how pursuing subrogation claims for climate-related losses would benefit the Company and its insureds, omitting proprietary information, and at a reasonable expense.

R. 1 (Compl.) Ex. 1, at 4.

In other words, having previously submitted climate-themed proposals that sought generalized reporting on greenhouse gas emissions and progress toward the Paris Climate Accord emission target—and, in the most recent instance, received only 13.9% of the shareholder vote—AYS has now shifted to a proposal that asks shareholders to second-guess the internal decisions regarding the legal mechanism Chubb Ltd. uses to recover losses in individual claims, namely subrogation. *See* Lin Decl. Ex. C.

## I.    Chubb Ltd. Determines AYS's Proposal Should Be Excluded From Its Proxy

Chubb Ltd. concluded AYS's latest proposal infringes on ordinary business operations and seeks to micromanage the day-to-day work of assessing and managing subrogation litigation strategy. R. 1 (Compl.) Ex. 2. On January 13, 2026, Chubb Ltd. notified the SEC staff that Chubb Ltd. intended to exclude the proposal from its proxy materials under Rule 14a-8(i)(7), the Ordinary Business Exclusion and the Micromanagement Exclusion. R. 1 (Compl.) Ex. 2. The SEC responded on January 15, 2026, saying it "will not object if the Company excludes the Proposal from its proxy materials." R. 1 (Compl.) Ex. 4.

## J.    Procedural Posture & Service of Process

Nearly two months after the SEC staff's issuance of a statement of no objection, AYS filed its Complaint on March 3, 2026. R. 1 (Compl.). No material facts changed between January 15 and March 3. AYS then waited another week before it filed its Motion for Preliminary Injunction on March 11, 2026. R. 6 (Mot. for Prelim. Inj.).

Chubb Ltd. is domiciled in and maintains its principal place of business in Switzerland. Its

12

annual shareholder meeting, at which shareholder votes on proxy questions are tabulated and certified, is conducted in Zurich, Switzerland, in accordance with Chubb Ltd.'s Swiss Articles of Association.   Switzerland is a signatory to the Hague Convention, an international treaty "[d]esiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time."  Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 1969 20 U.S.T. 361 (1965) (the "Hague Convention").

Under the Hague Convention, a party seeking to serve documents on Chubb Ltd. must follow specific procedures outlined under the Convention, including, translating the underlying documents.  20 U.S.T. 361 (Art. 5).[7]  The appropriate authority in the requesting state must then transmit the translated documents to the Swiss-designated "[c]entral [a]uthority."  20 U.S.T. 361 (Art. 3).  The central authority, in turn, uses methods provided by Swiss law for service of the documents upon the defendant.  20 U.S.T. 361 (Art. 5).  While some Hague Convention signatories have permitted alternative service by mail under Article 10 of the Convention, Switzerland has expressly objected, and thus service by mail is prohibited under Swiss law.[8]

In certain limited circumstances concerning Chubb Ltd.'s securities offerings, Chubb Ltd. has authorized U.S.-based agents to receive service of process.  Froud Decl. ¶ 12 (citing Chubb Ltd. Prospectus Supplement (Aug. 4, 2025) (stating that "investors may serve Chubb with process in the United States with respect to actions against it arising out of or in connection with violations

---

[7]     *See* Switzerland's Central Authority & Practical Information, retrieved from the Hague Conference on Private International Law on March 17, 2026 (available at https://www.hcch.net/index.cfm?oldlang=en&act=authorities.details&aid=276).

[8]     *See* U.S. Embassy for Switzerland and Liechtenstein, Service Process, available at https://ch.usembassy.gov/service-process/ ("In their accession to the treaty, the Swiss noted that service by mail directly to the parties involved is not permitted.").

of U.S. Federal securities laws *relating to offers and sales of the securities covered by this prospectus* by serving Chubb Group Holdings Inc., its United States agent irrevocably appointed for that purpose") (emphasis added)); Chubb Ltd. Form S-3 Registration Statement (Oct. 3, 2024) (same); Chubb Ltd. Form S-3 Registration Statement (Oct. 9, 2018) (stating "investors may serve Chubb with process in the United States with respect to actions against it arising out of or in connection with violations of U.S. Federal securities laws relating to offers and sales of the securities covered by this prospectus by serving Chubb INA, its United States agent irrevocably appointed for that purpose")).  But these authorizations are for claims related only to offers and purchases of the securities covered by particular offering documents.  Chubb Ltd. has not authorized any agent for broad-based service of process to accept service for any other claim, such as claims concerning Chubb Ltd.'s corporate governance.  Froud Decl. ¶ 13.

### K.    Plaintiff Improperly Attempts Service Through a US Subsidiary

On March 3, 2026, the same day it filed its Complaint in this action, Plaintiff emailed its Summons and Complaint to Margriet Schaberg (Chubb In-House Legal Counsel) to inquire whether Chubb Ltd. had a domestic agent for service of process.  Lin Dec. Ex. D.  Ms. Schaberg promptly explained that no such agent existed and Hague Convention service would be required for Plaintiff's claim.  In response, Plaintiff represented that it "plan[ned] to effect service pursuant to the Hague Convention."  *Id.*

Nevertheless, on March 10, 2026, Plaintiff purported to effectuate service on Chubb Ltd. by mailing a summons and complaint to Chubb Group Holdings Inc. ("Chubb Holdings US") at 550 Madison Avenue, New York, NY 10022.  *See* ECF No. 5.  Chubb Ltd. is not located at that address, nor has Chubb Ltd. designated Chubb Holdings US or any other entity as an agent for service of process in this action.  Froud Decl. ¶¶ 8, 11.  Plaintiff knows that Chubb Ltd. is located in Switzerland, as it has engaged with Chubb Ltd.'s shareholder meeting activities there for several

14

years.  Indeed, Plaintiff sent its proposal to Chubb Ltd. in Zurich.  R. 1 (Compl.) Ex. 1 (November 26, 2025 Letter from Andrew Behar to Joseph F. Wayland using a Zurich address).

According to Plaintiff, its justification for eschewing Hague Convention requirements was the language in Chubb's Form S-3 Registration Statement.[9]  But as explained above, that language does not encompass the shareholder proposal claims Plaintiff asserts, nor has Plaintiff demonstrated which Registration Statement authorization would even apply.

ARGUMENT

**I.      Service Was Improper and, Thus, This Court Lacks Jurisdiction Over Chubb Ltd.**

"Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant."  *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (quoting *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999)). It serves as "not only a means of 'notifying a defendant of the commencement of an action against him,' but 'a ritual that marks the court's assertion of jurisdiction over the lawsuit.'"  *Id.*  "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *see also Saleh v. Al Nahyan*, 2021 WL 7210780, at *3 (D.D.C. July 16, 2021) ("Federal courts lack the power to assert personal jurisdiction over a defendant unless the procedural requirements of service of process are satisfied.").

Where, as here, service has been made improperly (or not at all), dismissal is warranted under Rule 12(b)(5).  *Simpkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) (recognizing district court's authority to dismiss claims due to insufficient service of process); *Jouanny v.*

---

[9] *See* Chubb Limited Form S-3 Registration Statement (October 3, 2024), available at https://www.sec.gov/Archives/edgar/data/896159/000110465924105722/tm2424896-1_s3asr.htm.

*Embassy of France in the U.S.*, 220 F. Supp. 3d 34, 37 n.1 (D.D.C. 2016) ("[A] Rule 12(b)(5) motion is the proper vehicle for challenging the mode of delivery or the lack of delivery of the summons and complaint." (internal quotation marks omitted)).  Plaintiff bears the burden to "demonstrate that the procedure employed satisfied the requirements of Rule 4 and any other applicable provision of law." *Cruz-Packer v. Dist. of Columbia*, 539 F. Supp. 2d 181, 186 (D.D.C. 2008) (internal quotation marks omitted); *see also Wilson v. Prudential Fin.*, 332 F. Supp. 2d 83, 88 (D.D.C. 2004) (service insufficient where plaintiff failed to show that recipient of summons was defendant's agent for service).  Plaintiff cannot satisfy that burden and, thus, the Court should dismiss Plaintiff's complaint without prejudice.

### A.    Plaintiff Has Not Complied with Hague Convention Requirements

Federal Rule of Civil Procedure 4(f) governs service on parties, like Chubb Ltd., located outside the United States.  Rule 4(f) provides that service may be made "at a place not within any judicial district of the United States by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."  Fed. R. Civ. P. 4(f).

Chubb Ltd. is a Swiss corporation, located in Zurich, Switzerland.  *See* Froud Decl. ¶ 5.[10] Switzerland is a signatory to the Hague Convention, which is designed to "provide a simpler way to serve process abroad . . . and to facilitate proof of service abroad."  *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988).  The Convention applies "in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial

---

[10]    In determining whether Plaintiff has met its burden on service, the Court may consider materials outside the pleadings.  *See Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

16

document for service abroad." *Id.* at 699 (quoting 20 U.S.T. 361, 362); *see also Watch Tower Bible & Tract Soc'y of Pa. v. Russian Fed'n*, 804 F. Supp. 3d 153, 160 (D.D.C. 2025) ("Compliance with the [Hague] Convention is mandatory in all cases to which it applies[.]"); Advisory Committee Notes to 1993 Amendment to Rule 4(f) (same).

Because of the mandatory nature of the Convention's procedures, courts give faithful effect to the Hague Convention and its requirements. In *Watch Tower Bible & Tract Society of Pennsylvania v. Russian Federation*, this Court emphasized that as a general principle, "district courts cannot circumvent the Hague Convention at whim" and held that a plaintiff's attempt to effect service in Russia by courier or mail was ineffective under the Hague Convention. 804 F. Supp. 3d at 164 (dismissing claim for improper service). And as for Chubb Ltd. in particular, courts consistently reject attempts by plaintiffs to avoid strict compliance with Hague Convention procedures in Switzerland. *See, e.g.*, *GR OPCO, LLC v. Chubb Ltd.*, 2021 WL 7500321, at *1 (S.D. Fla. Jan. 27, 2021) ("The Hague Convention applies to Chubb in this case"); *Gentry v. Chubb*, 2022 WL 1082453, at *5 (D.N.J. Apr. 11, 2022) (same).

In *GR OPCO*, plaintiff sought to serve Chubb Ltd. via email and physical delivery to a US-based subsidiary rather than to Chubb Ltd. under Hague Convention procedures because Chubb had actual notice of the suit and following the Convention's procedures would amount to "useless make-work" and delay. 2021 WL 7500321, at *4. The Court rejected plaintiff's attempt to evade the required procedures, however, finding no basis to depart from the Hague Convention requirements. *Id.* at *5 ("[W]e decline to authorize alternative service at this time because Plaintiffs have not attempted to serve Chubb through the Hague Convention.").

The same result is warranted here. Plaintiff has not even attempted to comply with the Hague Convention. Plaintiff simply mailed its Summons and Complaint to a different entity,

17

Chubb Holdings US, which is located in New York, New York.  The existence of a subsidiary-parent relationship cannot satisfy service requirements on the parent company itself.  *See Bastani v. Am. Fed'n of Gov't Emps., AFL-CIO*, 2022 WL 2156998, at \*2 (D.D.C. June 14, 2022) ("In general, service on a parent, subsidiary, cosubsidiary, or affiliate of a corporate defendant is not service on the defendant, and many cases so hold" (internal quotation marks omitted)) (dismissing claim for improper service).  And, as a factual matter, Chubb Holdings US has not been authorized to accept service on Chubb Ltd.'s behalf except in limited circumstances inapplicable here, as discussed below.  Froud Decl. ¶¶ 12–13.  Thus, Plaintiff's attempt to serve Chubb Holdings US is wholly improper.

> **B.    Chubb Ltd.'s Registration Statement Authorization Does Not Apply.**

Plaintiff cannot use Chubb Ltd.'s limited designation of Chubb Holdings US as an agent for service of process here.  Certain of Chubb Ltd.'s SEC filings authorized Chubb Holdings US to accept service of process explicitly and exclusively for a limited purpose:  "with respect to actions against it arising out of or in connection with violations of U.S. Federal securities laws relating to offers and sales of the securities covered by this prospectus."[11]  In other words, certain Chubb Ltd.'s SEC filings provided a method for service exclusively for claims alleging violations arising from offer and sales under that specific offering document.

Designation of an agent for service of process for a specified, limited purpose does not waive Chubb Ltd.'s right to proper service for all types of claims brought by all types of plaintiffs.  Courts routinely uphold limitations on the scope of an agent's authority to accept service, including

---

[11]    Chubb Ltd. Form S-3 Registration Statement (October 3, 2024), available at https://www.sec.gov/Archives/edgar/data/896159/000110465924105722/tm2424896-1_s3asr.htm; *see also* Chubb Ltd. Prospectus Supplement (Aug. 4, 2025), available at https://www.sec.gov/Archives/edgar/data/896159/000110465925074263/tm2521669-2_424b2.htm (same language).

specifically where, as here, the limitation appears in a foreign company's registration statement. *See, e.g.*, *Boustead Secs., LLC v. Leaping Grp. Co.*, 2020 WL 6263754, at *3 (S.D.N.Y. Oct. 22, 2020) (service improper where foreign-corporation appointed via registration statement a limited agent to receive service of process only for cases brought under federal or state securities laws, and plaintiff's claims were unrelated).  Black-letter agency law holds that a "person with notice of a limitation which has been placed on an agent's authority"—as Plaintiff here was on notice, *see supra* at Section II.J—"cannot subject the principal to liability upon a transaction with the agent if he knows or should know that it is outside the scope of the agent's authority."  *Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 24 (2d Cir. 1974).

Here, the scope of the authorizations cited by Plaintiff explicitly include only claims relating to the "offers and sales" of securities covered by the specific Registration Statements at issue.[12]  Plaintiff's claims, by contrast, do not arise from the offer or sale of securities, let alone any particular securities covered by a specific Registration Statement.  Plaintiff does not, for example, allege misstatements or other violations relating to its share purchases, or even identify in which offering its shares were purchased (if any).  As for the October 3, 2024 Form S-3 and the August 4, 2025 Prospectus Supplement that Plaintiff has identified, Plaintiff's claim cannot possibly have anything to do with the securities covered by those documents, as Plaintiff alleges it has continuously held its stock since December 7, 2020.  R. 1 (Compl.) ¶ 18.  And even if Plaintiff could identify the specific registration statement under which it bought its shares, there is nothing in any registration statement that contem[plates the kind of shareholder proposal lawsuit Plaintiff brings here.

The nature of AYS's claim is clearly outside the scope of Chubb Ltd.'s service authorization

---

[12]        *See supra* Section I.B.

19

for offer-and-sale lawsuits.  This is a shareholder proposal dispute, directed at the proxy process, which is governed by Chubb Ltd.'s Articles of Association and is an integral component of the Chubb Ltd.'s annual general meeting, which occurs in Switzerland.  It is unrelated to any issuance of securities.  It simply is false, an agent appointed for service related only for claims related to offers and sales of securities encompasses proxy voting.  To so hold would make the authorization nearly boundless, as any suit brought by a shareholder concerning Chubb Ltd.'s governance and business operations could be construed as somehow related to securities' purchases.  *See, e.g.*, *Stallard v. Goldman Sachs Grp., Inc.*, 2022 WL 59395, at \*7 (Jan. 6, 2022 D.D.C.) (plaintiff failed to show agent was authorized to accept service, explaining that "[a]ny agent who accepts service must be shown to have been authorized to bind his [or her] principal by the acceptance of process") (quoting *Schwarz v. Thomas*, 222 F.2d 305, 308 (D.C. Cir. 1955); *cf. Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (distinguishing federal securities-law matters from corporate-governance matters).  It is axiomatic that a dispute about the propriety of excluding a shareholder proposal is distinct from a claim based on an alleged securities-law violation in an offer or sale.

Thus, Plaintiff's attempt to serve Chubb Ltd. through Chubb Holdings US was unauthorized and improper and warrants dismissal of its claim.

## II.    Laches Applies as a Result of AYS's Three-Month Delay and Bars Relief Here.

"Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights."  *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985).  AYS slumbered here, despite its experience in submitting shareholder proxy proposals many times over annually, and equity accordingly requires denial of its preliminary injunction request and dismissal of its claims.

Injunctive relief is "an extraordinary remedy" reserved only for plaintiffs who have made a "clear showing" that they are entitled to such relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555

20

U.S. 7, 22 (2008). When a plaintiff has unreasonably delayed seeking relief to the detriment of the defendant, the doctrine of laches renders that extraordinary relief inappropriate. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 84 (D.D.C. 2017). A laches defense requires the defendant to show first, that the plaintiff lacked diligence in asserting their rights and second, that the defendant was prejudiced. *Id.* (citing *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010)). The diligence inquiry turns on the reasonableness of the plaintiff's delay and is highly dependent on "the particular circumstances of each case." *Mahan v. Tash*, 703 F. Supp. 130, 131 (D.D.C. 1989) (quoting *Haliday v. Haliday*, 11 F.2d 565, 569 (D.C. 1926)). Affirmative defenses can be raised via Rule 12(b)(6) when the relevant facts are apparent on the face of the complaint. *Gardner v. Erie Ins.*, 639 F. Supp. 3d 135, 141 (D.D.C. 2022).

AYS was fully aware of all of the facts relevant to Chubb Ltd.'s denial of its proposal as of January 15, 20206, when the SEC issued its "No Objection" letter to Chubb Ltd. There was nothing standing in the way of AYS filing this lawsuit the very next day; AYS could have, and should have, lined up counsel in advance if it wanted to litigate the predictable exclusion of its proposal and filed its lawsuit immediately after receipt of the SEC's "No Objection" letter. Nevertheless, AYS waited nearly two months to file its Complaint and just a month before Chubb Ltd. was expected to finalize its proxy materials. R. 1 (Compl.) Exs. 2, 4. It then delayed another week to file its Motion for Preliminary Injunction. R. 6 (Mot. for Prelim. Inj.).

AYS's delay, especially in the context of its knowledge and experience, is unreasonable and inexcusable. In cases considering the reasonableness of plaintiff's time-sensitive motion for preliminary injunction, courts routinely find delays of this level inexcusable and unreasonable. *See Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, 2025 WL 2996157, at *5 (D.D.C. Oct. 24, 2025) (collecting cases finding delays as short as 44 days or two months inexcusable).

21

Chubb Ltd. suffers both trial and economic prejudice due to AYS's delay. *Mahan*, 703 F. Supp. at 133 (recognizing both forms of prejudice as grounds to support laches). Chubb Ltd. is prejudiced by this unnecessarily rushed legal proceeding, which could have been litigated over a matter of months, not days. Indeed, it seems clear that AYS's two-month delay in filing its complaint was at least in part intended to collapse the service issue discussed above into consideration of the substance of its proposal, causing a threshold procedural issue and a merits issue to be briefed simultaneously. This would have been unnecessary had this case been filed back in January.

Chubb Ltd. is economically prejudiced because, as the SEC has consistently recognized, shareholder proposals come at a cost to companies and their shareholders.[13] AYS's late filing has diverted employee time and distracted management and may force Chubb Ltd. to incur rushed charges related to the dissemination of its proxy statement, or substantial additional printing fees up to $1.055 million. Froud Decl. ¶ 20.

Chubb Ltd. also incurs business harms and opportunity costs. Chubb Ltd. deliberately plans for its proxy materials to be completed, prepared, and reviewed, including by its senior executive officers and directors, for distribution ahead of the SEC's deadline for using the SEC notice and access rule. *Id.* at ¶ 15. Last-minute modifications to proxy materials require significant employee attention on an accelerated timeline, including the time and expense for Chubb Ltd.'s legal and compliance teams, who must substantively review the now-changed proxy materials. *Id.* at ¶ 16. Because senior legal, governance, and advisory personnel often handle these reviews, they can generate significant additional labor costs and operational disruption in situations like this

---

[13]     *See, e.g.*, SEC Release No. 12999. That shareholder proposals impose an expense on corporations is likewise judicially noticeable as a readily discernable fact not subject to reasonable dispute. Fed. R. Evid. 201.

where the company is forced to consider last minute amendments. *Id.* at ¶ 17. Additionally, delays in disseminating proxy materials can have knock-on effects, including postponement of the annual general meeting, which can in turn lead to Chubb Ltd. not being able to conduct basic corporate functions that must be approved by shareholders under Swiss law, including paying dividends, approving director compensation, and approving a renewed capital band, and possessing a functioning Board of Directors. *Id.* at ¶ 21.

Ultimately, AYS is not entitled to an equitable remedy when its own delay will produce an inequitable result.

### III.    AYS Cannot Meet Its Burden to Justify the "Extraordinary Remedy" of An Affirmative Preliminary Injunction and Dismissal is Appropriate for the Same Reasons as a Matter of Law.

"A preliminary injunction is an extraordinary remedy never awarded as of right," but instead, only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 24. The plaintiff bears the burden of showing that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Id.* at 20. When, as here, the plaintiff seeks an affirmative injunction that compels the defendant to act rather than demand his restraint, the plaintiff "must meet a higher standard." *Nat'l Conf. on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (quoting *Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd* 159 F.3d 636 (D.C. Cir. 1998)). In such circumstances, the plaintiff must demonstrate that he is "clearly," rather than simply likely, entitled to relief under the law and would face "extreme or very serious damage" if injunctive relief is denied. *Id.* (internal quotation marks omitted).

The court is also well positioned to dismiss AYS's complaint with prejudice pursuant to Rule 12(b)(6). A court may dismiss a complaint when it lacks "factual allegations that are 'enough

23

to raise a right to relief above the speculative level.'"  *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 243 F. Supp. 3d 141, 147–48 (D.D.C. 2017) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)).  Whether a proxy proposal was properly excluded is appropriate for resolution as a matter of law.  *See Hall v. Tyco Int'l Ltd.*, 223 F.R.D. 219, 248 (M.D.N.C. July 27, 2004) (dismissing claim alleging improper exclusion of a proxy proposal after finding, as a matter of law, that the ordinary course of business exclusion applied).  Here, even taking AYS's allegations as true and merely reviewing the materials included in AYS's complaint, the record is sufficient as a matter of law to conclude that Plaintiff's proposal was properly excludable under Rule 14a-8(i)(7).[14]

### A.   AYS Has Not Shown a Substantial Likelihood, Let Alone Clear Likelihood, of Success on the Merits—and Cannot Prevail on the Merits as a Matter of Law—for Two Independent Reasons

AYS cannot prove that it is likely to succeed on the merits, let alone that the law clearly favors its position, because AYS has no legal right to insist on the inclusion of its proposal in Chubb Ltd.'s proxy materials.  "A 'proper' proposal is one that doesn't fit within one of Rule 14a-8's exclusionary grounds—which are both substantive and procedural."  *Trinity*, 792 F.3d at 336.  The SEC rules expressly permit exclusion of proposals like the one AYS advances here on at least two grounds: the Ordinary Business Exclusion and the Micromanagement Exclusion.[15]

---

[14]   The Court need not (and for Rule 12(b)(6) purposes, should not) consider any factual evidence to determine that Chubb Ltd. prevails as a matter of law.  That Chubb's business as an insurance company necessarily involves subrogation—and thus the applicable exclusions apply to AYS's proporsal—is obvious from the simple fact the Chubb is an insurance company, as detailed below.  But witness declarations support the preliminary injunction opposition, nonetheless, in case additional detail is helpful to the Court's consideration of the preliminary injunction motion.

[15]   AYS's proposal is also independently excludable because it calls for action already substantially underway by a company.  *See* Rule 14a-8(i)(10).  Through the Subrogation Framework, Chubb already analyzes the subrogation potential of all losses, including climate-impacted losses.  Mannion Decl. ¶ 11.  Chubb pursues subrogation claims for which there is a legal, financial and business justification for doing so.  O'Brien Decl. ¶ 8.  AYS's proposal should not be included in Chubb Ltd.'s proxy materials because there is no need, or benefit, to

Absent any basis to obtain its requested relief, AYS's preliminary injunction motion should be denied and Chubb Ltd.'s motion to dismiss on Rule 12(b)(6) should be granted. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (identifying likelihood of success on the merits as the "most important factor"); *see also Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1254 (D.C. Cir. 2006) (finding "no need to address the other preliminary injunction factors" upon finding "little likelihood of succeeding on the merits").

1.      AYS Lacks a Private Right of Action

As a threshold matter, AYS lacks standing to bring this suit.  The Supreme Court made clear in *Alexander v. Sandoval* that "private rights of action to enforce federal law must be created by Congress."  532 U.S. 275, 286 (2001).  Without clear statutory intent, courts may not recognize or create causes of action that Congress has not authorized, regardless of "how desirable [they] might be as a policy matter."  *Id.* at 286–87.  Courts review the plain text and structure of a statute to determine whether Congress intended it to confer rights to private litigants.  *Id.* at 288–89.

AYS's claims are barred because Rule 14a-8 provides no private right of action.  Nothing in the Rule or its underlying statutory authority contain rights-creating language, nor any indication that Congress intended private enforcement.  *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-8.

AYS relies on *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416 (D.C. Cir. 1992), to argue that Rule 14a-8 carries a private right of action.  But *Roosevelt* is no longer good law to the extent it recognizes such a right.  Critically, *Roosevelt* relies on *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), which supplied the now-rejected basis for implying private remedies from statutory purpose.  The Supreme Court in *Sandoval* expressly stated that *Borak* reflects an outdated

---

shareholders voting on a proposal that is already substantially in place.  Nor can AYS nitpick that Chubb's approach to subrogation is not precisely what AYS would prefer.  The SEC previously excluded only "fully implemented" proposals—but changed the rules to broaden the exclusion after recognizing this prior approach was too restrictive.  *See* SEC Legal Bulletin No. 14M.

25

approach to statutory interpretation, under which courts wrongly implied private rights of action according to perceived statutory intent.  531 U.S. at 287 ("[We have] sworn off the habit of venturing beyond Congress's intent.").  Because *Roosevelt* depends on a discredited framework set forth in *Borak*, it cannot support AYS's position here.

        2.      AYS's Proposal Is Properly Excluded Under the Ordinary Business Exclusion in SEC Rule 14a-8(i)(7)

AYS's proposal concerns a core element of Chubb's insurance business and its ordinary operations: how to deploy the tool of subrogation to manage the risks that Chubb insures.  SEC Rule 14a-8(i)(7) applies on its face and permits exclusion of this proposal.

In *Trinity*, a circuit court provided a three-step guide for applying the Ordinary Business Exclusion, consistent with the text of Rule 14a-8(i)(7) and the SEC's interpretations of it.  *See Trinity*, 792 F.3d at 341.  *First*, the court "discern[s] the 'subject matter' of the proposal," elevating the proposal's substance over its form.  *Id.* at 341.  *Second*, the court makes a fact-specific inquiry into whether the proposal's subject matter "*relates*—that is, bears on" the company's "ordinary-course matters."  *Id.* at 344–45.  *Third*, the court determines whether the proposal "raise[s] a significant [social] policy issue that *transcends* the nuts and bolts of [the company's] business" such that "it would be appropriate for a shareholder vote."  *Id.* at 341 (emphasis added), 345. Whether the Court applies this framework or not, the key question remains: does "[t]he subject matter [of AYS's proposal] relate[] to certain tasks that are 'fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight.'"  See Amendments to Rules on Shareholder Proposals, 63 Fed. Reg. 29,108.  Here, the answer is clearly yes, rendering AYS's proposal excludable.

AYS jumps ahead to the third prong—effectively conceding the first two points.  For completeness, however, Chubb Ltd. addresses each step of the Ordinary Business framework below.

a.    AYS's Proposal Targets Chubb's Subrogation Strategy, and Also Concerns Chubb's Rate-Setting and Risk Assessments

The subject matter of AYS's proposal expressly bears on Chubb's subrogation strategy. AYS proposes that Chubb Ltd. "issue a third-party report assessing" the "if and how" of Chubb's pursuit of additional "subrogation claims."  R. 1 (Compl.) Ex. 1.  At its essence, AYS's proposal demands that Chubb Ltd. obtain a third-party's opinion regarding whether it should be employing alternative methods of mitigating its financial exposure through subrogation.  Elevating substance over form, the subject matter of the proposal is Chubb's decision-making process about subrogation and potential subrogation opportunities.

That AYS framed its proposal around the creation of a report (rather than, say, explicitly calling for adoption of a new subrogation strategy) is of no consequence.  As the D.C. Circuit has recognized, "[w]e need not linger over the report issue" because the relevant question is the "subject matter of the [requested] report."  *Roosevelt*, 958 F.2d at 428 (citing SEC rule amendments and finding a shareholder proposal calling for a report about certain pollutants concerned Du-Pont's ordinary course of business).  "The subject matter of the proposal is . . . its ultimate consequence."  *Trinity*, 792 F.3d at 342.  Courts elevate "substance over form" in this subject matter inquiry.  *Id.* at 341.

The decision in *Trinity* illustrates this principle.  There, plaintiff's proposal sought an evaluation of whether Walmart should continue to sell firearms and other potentially dangerous products. *Id.* at 330.  Plaintiff framed the goal of the proposal as "promoting improved [corporate] governance," such as with respect to safeguarding Walmart's "reputation and brand value."  *Id.* at

27

328–29.  The Third Circuit rejected the plaintiff's broad characterization of its proposal and instead examined the proposal's likely practical effects, particularly given the plaintiff's focus on Walmart's sale of guns.  *Id.* at 342.  The court concluded that "[s]tripped to its essence," the proposal was simply about "what [Walmart] sells on its shelves."  *Id.* at 328; *see also id.* at 342 (adding that the proposal ultimately "could (and almost certainly would) shape what products are sold by" the company).

Thus, when finding the subject matter of a proposal, the court must look beyond the framework to the substance.  Here, the substance of AYS's proposal is Chubb Ltd.'s subrogation strategy.  R. 1 (Compl.) Ex. 1, at 4.

b.      Chubb's Subrogation Strategy Relates to Its Ordinary Business Operations as an Insurance Company, as Do the Other Subjects of AYS's Proposal

Courts applying Rule 14a-8(i)(7) next ask whether the proposal's subject matter "relates to" the company's day-to-day business operations.  *Trinity*, 792 F.3d at 344–45.  Here, each of the distinct subjects of AYS's proposal—subrogation, rate-setting, and risk assessment—are related to Chubb's day-to-day operations.

For each claim that it handles, Chubb applies a proprietary Subrogation Framework to assess the claim's subrogation potential.  Mannion Decl. ¶¶ 11–13.  Chubb then uses in-house specialists and outside counsel to more closely examine the risks and benefits of pursuing subrogation for individual claims.  *Id.*  This process is robust, as well as highly technical, from both a legal and factual standpoint, and is informed by a plethora of factors.  *See* Mannion Decl. ¶¶ 6–14.

In *Trinity*, the Third Circuit held that plaintiff's proposal addressing whether Walmart should sell firearms implicated the company's ordinary business because "a retailer's approach to its product offerings is the bread and butter of its business."  792 F.3d at 344.  The court also made

28

clear that the threshold for this aspect of Rule 14a-8(i)(7) inquiry is low.  It explained that there may be "no doubt" that a proposal is excludable under the Rule "so long as the subject matter of the proposal [simply] *relates*—that is, bears on—a company's ordinary business operations."  *Id.* at 344–45.

AYS's proposal attempts to shape Chubb's subrogation practices, and thus "strikes at the core" of how Chubb manages losses in the ordinary course of business.  *See id.* at 344; *see also* Mannion Decl. ¶ 6 ("Chubb pursues subrogation claims as part of its day-to-day business where it makes legal and business sense to do so.").  The practical effect of the proposal would be to infringe upon how Chubb approaches individual subrogation litigation decisions in a whole host of claims—decisions that are currently made through a fact intensive and proprietary process permeated with business judgment—while also seeking to impact Chubb's other business strategies concerning rate-setting and risk assessment.  Because the proposal seeks to expand the circumstances in which Chubb would pursue subrogation and concerns these additional business functions as well, it undoubtedly "bears on" the company's ordinary business operations.  *Trinity*, 792 F.3d at 345.

> c.    By Seeking to Address Climate Harms Through the Insurance Tool of Subrogation, AYS's Proposal Strikes at Chub's Core Business Function—Not a "Transcendent" Policy Issue
>
> > *(1)    AYS Applies the Wrong Standard and Ignores Relevant Precedent*

AYS's attempts to recast a dispute over subrogation strategy as a "climate" proposal, but this does not bring the proposal within the narrow social-policy exception to Rule 14a-8(i)(7).  The proposal principally attempts to shape Chubb's subrogation practices and approaches individual subrogation litigation decisions in a whole host of claims, as well as Chubb's rate-setting and

29

risk-assessment judgments. The social policy exception does not apply in light of Chub's specific business structure.

AYS applies the wrong standard in arguing that this proposal is central to a core climate issue so significant that its proposal should be exempt from the Ordinary Business Exclusion. That is not how SEC Rule 14a-8(i)(7) works. The SEC's exception for proposals raising significant social policy issues applies only to proposals that "transcend the day-to-day business matters" based on an individual case-by-case assessment of a company's business. *See* SEC Legal Bulletin No. 14M. AYS's proposal fails this test.

"[T]he rulings, interpretations and opinions of [an Administrative Agency] . . . while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Division of Corporation Finance's interpretations of the exclusion as articulated in its Staff Legal Bulletins, provide evidence of SEC Rule 14a-8(i)(7)'s meaning. Therefore, although these authorities are not binding on courts, the court should give weight to these bulletins based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.*; *see also Trinity*, 792 F.3d at 342 n.11 (recognizing that SEC materials are not binding on courts, but are nevertheless afforded "careful consideration"); *Tosdal*, 440 F. Supp. 3d at 1194–95 (same).

In its motion, AYS relies almost exclusively on such non-authoritative bulletins from the Division of Corporation Finance for the proposition that its proposal transcends Chubb's day-to-day business matters. This is probably because *Trinity* and *Tosdal*, the two leading cases in the area of interpreting Rule 14a-8(i)(7), come down squarely against it. But questions of weight-of-

30

authority aside, AYS's proffered bulletins do not even stand for the propositions for which they are cited. AYS argues (twice) that SEC Legal Bulletin No. 14M supports AYS's contorted reading of the standard. R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj) at 13, 17 (citing SEC Legal Bulletin No. 14M). Not so. AYS states, incorrectly, that this February 12, 2025 bulletin opines that a proposal that "focuses on a significant policy issue that has a sufficient nexus to a particular company" is not excludable under Rule 14a-8(i)(7). *See id.* (quoting SEC, Legal Bulletin No. 14M). The SEC's bulletin says the opposite:

> [T]he staff will take a company-specific approach in evaluating significance, **rather than focusing solely on whether a proposal raises a policy issue with broad societal impact or whether particular issues or categories of issues are universally "significant."** Accordingly, a policy issue that is significant to one company may not be significant to another. The Division's analysis will focus on whether the proposal deals with a matter relating to an individual company's ordinary business operations or raises a policy issue that transcends the individual company's ordinary business operations.

SEC Legal Bulletin No. 14M (emphasis added). This Bulletin further confirms that a given proposal's "significance in relation to the company" is decisive. *Id.* That is, a company-specific analysis is required to determine whether a policy matter nonetheless "relat[es] to an individual company's ordinary business operations" and thus may be excluded. *Id.*

Plaintiff is likewise incorrect in its assertion that any prior SEC comments provide for a categorical policy exception under Rule 14a-8(i)(7)—for they do not. *See, e.g.*, R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj.) at 12–13 (citing SEC, Release No. 34-40018, 29108; SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021)). Plaintiff's selective quotations from these sources elide the key limitations recognized by the SEC, as well as court opinions interpreting the relevant standard. When read in full, the SEC's guidance makes clear that merely invoking a social policy issue is not enough. For example, even the 1998 guidance cited by AYS clarifies that proposals

31

concerning social policy issues "would not be considered to be excludable" only if they "transcend the [company's] day-to-day business matters."  SEC, Release No. 34-40018.  The 2021 guidance cited by AYS is now rescinded.  *Compare* R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj.), at 13 (citing SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021)), *with* SEC Staff Legal Bulletin No. 14M (rescinding SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021)).

AYS fails to cite cases dealing with the social policy exception—because none of these cases supports AYS's position.[16]  Courts that have addressed this exception all agree:  it is not sufficient to simply incant that a proposal concerns an important social issue to meet the standard of Rule 14a-8(i)(7).  *E.g.*, *Tosdal*, 440 F. Supp. at 1200 (finding a plaintiff's climate-related proposal properly excluded, and explaining, "[E]ven though the Proposal raises sufficiently significant social policy issues, it fails to transcend the [defendant's] ordinary business operations."); *see also Trinity*, 792 F.3d at 346–47 (excluding a gun control-related proposal because invoking a socially important issue is not enough on its own; "the subject matter of [a] proposal must 'transcend' the company's ordinary business").  For a proposal to transcend a company's ordinary business, it must be "divorced from how a company approaches the nitty-gritty of its core business."  *Trinity*, 792 F.3d at 347.

AYS also omits the import of the *Roosevelt* decision.  AYS asserts that "it is those matters that bear on a company's 'fundamental business strategy' or 'long-term goals' that the SEC has recognized as particularly appropriate subjects for shareholder proposals."  R. 6-1 (Mem. in Supp. of Mot. for Plim. Inj.) at 17 (citing *Roosevelt*, 958 F.2d at 427).  But AYS ignores that the SEC

---

[16]    AYS cites *Med. Comm. for Hum. Rts. v. SEC*, 139 U.S. App. D.C. 226, 432 F.2d 659 (D.C. Cir. 1970), R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj.) at 15, in discussing the public policy exception but fails to note that the Supreme Court vacated this decision.  *SEC v. Med. Comm. for Hum. Rts.*, 404 U.S. 403 (1972).

advocated for exclusion of the shareholder proposal in *Roosevelt*. 958 F.2d at 426–27, n.17. That proposal, which concerned a proxy directing DuPont to phase out certain pollutants and report on its progress concerning the same, intruded on the business judgment of DuPont, according to the SEC's review. Most importantly (and absent from AYS's brief) is that the D.C. Circuit court agreed, concluding that the proposal's climate-focused terms "deal[] with matters relating to the conduct of ordinary business operations of Du Pont . . . [and] Du Pont properly omitted [the] proposal from its proxy statement." *Id*. at 425.

The relevant question is whether a plaintiff's proposal transcends the particular work performed by the company. To that end, the SEC's guidance states that a "'case-by-case' consideration of a particular company's facts and circumstances is a key factor in the analysis of shareholder proposals that raise significant policy issues." SEC Legal Bulletin No. 14M.

### (2)    The Policy Exception Is Inapplicable Here Because AYS's Proposal Fails to Transcend Chubb's Business Functions

AYS does not even attempt an individualized assessment of Chubb's business because doing so would be fatal to its argument. Reading AYS's proposal in the context of Chubb's specific business as an insurance company compels the conclusion that AYS's proposal would interfere with central Chubb business functions, including the analysis and application of the insurance-specific legal tool of subrogation. AYS's proposal thus fails to "transcend" Chubb's core business functions.

The decision in *Trinity* is instructive. The proposal there implicated serious public concerns about gun violence and product safety, but the court held it did not transcend Walmart's ordinary business—namely, Walmart's routine task of deciding which products to sell. *Trinity*, 792 F.3d at 348–50. The court held that such decisions were "too enmeshed with its day-to-day business." *Id.* at 348. The court further emphasized that the sales decisions shareholders sought to influence

33

ultimately "involve[d] a careful balancing of financial, marketing, reputational, competitive and other factors" which could not, "as a practical matter, be subject to direct shareholder oversight." *Id.* (quoting 1998 Adopting Release, 1998 WL 254809, at *4).

The district court in *Tosdal* followed *Trinity*'s analysis. There, although the shareholders' proposal invoked significant concerns about climate change, the court held it did not transcend the utility company-defendant's ordinary business because it concerned resource-planning decisions "[lying] at the core of [the company's] business." *Tosdal*, 440 F. Supp. 3d at 1200 ("[R]ather than disengaging from [the company's] core business, the Proposal enmeshe[d] itself in it."). The court concluded that the proposal was excludable given that the plaintiff-shareholder was "not well-positioned to opine on the basic planning choices made by [the company's] management." *Id.* *Tosdal* is further analogous to this case because, like here, in *Tosdal* the court did not need to consider the proposal in light of an SEC "no action" letter, because the SEC declined to issue one.

Here, the proposal seeks to direct Chubb's subrogation strategy, wrestling control of a litigation and risk management tool specific to Chubb's business as an insurance company. Mannion Decl. ¶ 5. Interference with a *litigation* tool is particularly fraught: Chubb's existing subrogation process involves outside legal counsel, who work to provide privileged legal advice to Chubb; such advice (like all litigation advice) necessarily identifies the strengths and weaknesses inherent in a subrogation claim. AYS's proposal seemingly ignores the fact that a public report on Chubb's subrogation strategy would either risk a waiver of the attorney-client privilege or be forced to strip out all of the legal analysis, rendering the whole effort superfluous. Logic compels the conclusion that a report outlining Chub's subrogation strategy would expose that strategy to the world, including to the potential targets of the particular subrogation actions

34

urged by AYS.  Companies do not typically disclose their legal strategies and assessments publicly. All of these flaws further underscore that the proposal strikes at the core of the business.

AYS's efforts to direct Chubb's rate-making and risk-assessment work fare no better. Chubb employs teams of skilled experts to manage Chubb's portfolio.  O'Brien Decl. ¶ 12.  These professionals analyze a broad range of economic information when assessing Chubb's potential exposure in different markets and for determining how Chubb should respond after making those assessments.  Assessing and managing the risks associated with climate change is also part of Chubb's ordinary business.  Employees at all levels of the company—from frontline underwriters to executives—are involved with considering the risks associated with climate.  *See* R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj.) at 15 (citing Chubb Ltd.'s Form 10-K and other public statements by Chubb's CEO about the impact of climate on the insurance industry); *see also* O'Brien Ex. A (Chubb's Annual Sustainability Report).

In sum, despite the significance of the policy concerns raised by AYS, it cannot use a shareholder proposal to infringe upon Chubb's core day-to-day business operations as an insurance company.  AYS's proposal is excludable as an improper attempt to inject shareholders into "basic business choices" they are "not well-positioned to opine on."  *Trinity*, 792 F.3d at 348; *see Tosdal*, 440 F. Supp. 3d at 1200 (stating same).

       3.     AYS's Proposal Is Independently Excludable Because It Impermissibly Micromanages Complex Operational Decisions

Chubb Ltd. properly excluded AYS's proposal on another independent basis:  AYS is not entitled to micromanage Chubb's business.

Separate and apart from the Ordinary Business Exclusion, Rule 14a-8(i)(7) also permits exclusion where a shareholder proposal would impermissibly micromanage complex operational decisions.  *See Apache Corp. v. N.Y.C. Emps.' Ret. Sys.*, 621 F. Supp. 2d 444, 450–51 (S.D. Tex.

2008); *see also* SEC Staff Legal Bulletin No. 14J § C.2 (Oct. 23, 2018) (recognizing the Micromanagement Exclusion is independent from the Ordinary Business Exclusion).  The SEC has explained that the Micromanagement Exclusion found in Rule 14a-8(i)(7) applies where a proposal "seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." *Apache Corp.*, 621 F. Supp. 2d at 451 (quoting SEC Release No. 34-40018, at 29,108). The Micromanagement Exclusion applies to proposals that "prescribe[] specific actions that the company's management or the board must undertake without affording them sufficient flexibility or discretion in addressing the complex matter presented by the proposal."  SEC Staff Legal Bulletin No. 14K (Oct. 16, 2019) (hereinafter "Staff Legal Bulletin 14K").

The Micromanagement Exclusion reflects the reality that shareholders are not positioned to make detailed operational decisions requiring technical expertise and day-to-day management oversight.  *Apache*, 621 F. Supp. 2d at 451 ("[M]anagement cannot exercise its specialized talents effectively if corporate investors assert the power to dictate the minutiae of daily business decisions.").  The Micromanagement Exclusion considers the entirety of a proposal to uncover what is really being asked of management, rather than simply assessing the impact of the proposal's "resolved" clause.  *See* Staff Legal Bulletin 14K § B.4.  There is no social policy exception to the Micromanagement Exclusion similar to the one discussed above with respect to the Ordinary Business Operations Exclusion, *supra* Section III.A.2.c(2).  *See, e.g.*, Staff Legal Bulletin 14K § B.4.

Here, the policy point is particularly acute because subrogation is a complex legal tool specific to the insurance industry and in Chubb's case subject to a proprietary framework. Mannion Decl. ¶ 11.  Chubb follows a detailed process to assess subrogation opportunities, and its

36

daily operations devote substantial time and resources to its subrogation strategy. Mannion Decl. ¶¶ 11–14; O'Brien Decl. ¶ 8. In particular, Chubb must evaluate the potential recoveries at stake for a case, assess the strength of possible claims, determine causation, weigh litigation costs and risks, and evaluate broader strategic and reputational implications before deciding whether to pursue subrogation. Mannion Decl. ¶¶ 6–10. Shareholders are not "well-positioned" to determine whether or how Chubb should alter its use of the legal tool of subrogation. Mannion Decl. ¶ 15; O'Brien Decl. ¶ 12.

Similarly invasive proposals have been rejected by courts as micromanagement. In *Tosdal*, the court considered a shareholder proposal requiring a utility company to plan for the closure of a power plant. 440 F. Supp. 3d at 1199–1200. The court explained that the proposal required "complex 'multi-disciplinary assessment of many varied factors'" and "expertise in technical fields," which shareholders are "not well-positioned to opine on." *Id.* Thus, the company permissibly excluded the proposal as micromanaging. Likewise, in *Apache*, the court held that a proposal requiring a broad nondiscrimination policy governing advertising, marketing, sales, and charitable activities was excludable under Rule 14a-8(i)(7). 621 F. Supp. 2d at 452–53. Although the proposal implicated issues of social policy, the court concluded that it sought to "micromanage the company to an unacceptable degree." *Id.* at 452. The court emphasized that "[s]hareholders, as a group, are not sufficiently involved in the day-to-day operations" of a company to make informed judgments about such decisions. *Id.* It therefore deemed it "imprudent to effectively cede control over such day-to-day decisions" to shareholders. *Id.* at 453.

By its terms, the proposal seeks to prescribe a specific method—a attenuated theory of causation in AYS's subrogation—to achieve (in AYS's telling) lower policyholder rates, thereby dictating how Chubb should exercise a highly technical legal mechanism that is both fact and

37

context specific in individual claims. In fact, the SEC identified proposals with climate connections as a prototypical example of excludable micromanagement. *See generally* Staff Legal Bulletin 14K. In 2019, the SEC explained in Staff Legal Bulletin 14K that a proposal seeking reporting on "short-, medium- and long-term greenhouse gas targets" was properly excluded as micromanagement. The SEC found that the "proposal micromanaged the company by prescribing the method for addressing reduction of greenhouse gas emissions" and, despite only seeking reporting, "effectively require[ed] time-bound targets (short, medium and long) that the company would measure itself against and changes in operations to meet those goals, thereby imposing a specific method for implementing a complex policy." *Id.* Like the SEC's example, AYS's proposal here seeks to prescribe a specific method—increased use of subrogation—to achieve (in AYS's telling) lower policyholder rates. The SEC's guidance prohibits such specific direction, even under the guise of reporting. *Id.*

The SEC provided an alternative example: a proposal that asked merely "if, and how, [a company] plans to reduce its total contribution to climate change" was not micromanagement, in the SEC's analysis. *Id.* This example differed from the greenhouse gas emissions reporting proposal, in the SEC's view, because this latter example "deferred to management's discretion to consider if and how the company plans to reduce its carbon footprint and asked the company to consider the relative benefits and drawbacks of several actions." *Id.* AYS's proposal, on the other hand, is entirely focused on the *whether* and *how* of Chubb's approach to using a particular litigation tool—subrogation—rather than deferring to management's day-to-day decision making.

AYS cannot circumvent the Micromanagement Exclusion on the grounds that it merely requests Chubb Ltd. to generate a report. R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj.) at 17–19. As already discussed, courts focus on a proposal's practical effect, not its form. *Trinity*, 792

38

F.3d at 341.  Under SEC guidance, a proposal calling for a report on day-to-day management may still be properly excluded.  *See* SEC Staff Legal Bulletin No. 14J §§ C.2–.3 (Oct. 23, 2018); *see also* Staff Legal Bulletin 14K.  The SEC consistently granted no-action relief under Rule 14a-8(i)(8) where shareholders sought to have companies generate reports on their operations – agreeing that such proposals may constitute impermissible micromanagement.  *See, e.g.*, *Amazon.com, Inc.*, 2025 WL 1423242 (Apr. 4, 2025) (granting no-action relief for a proposal requesting the company to assess its strategy regarding the use of customer data); *MetLife, Inc.*, 2023 WL 4251417 (Apr. 24, 2023) (same where proposal requested the company to report on the risks of certain business practices).  In fact, AYS has received several no-action letters from the SEC confirming the exclusion of its own proposals seeking such reports under Rule 14a-8(i)(8). *See, e.g.*, *Allstate Corp.*, 2025 WL 1423264 (Apr. 11, 2025) (granting no-action relief where AYS sought a report concerning company's strategy to address greenhouse gas emissions); *Hartford Ins. Grp.*, 2025 WL 1381730 (Apr. 3, 2025) (same); *Targa Res. Corp.*, 2025 WL 1381725 (Mar. 27, 2025) (same).

> **B.**     **The Remaining Preliminary Injunction Factors Favor Chubb Ltd. and Require Denial of AYS's Requested Relief.**

A plaintiff's failure to show a likelihood of success on the merits obviates the need to consider the remaining preliminary injunction factors.  *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 n.3 (D.C. Cir. 2025).  But the remaining factors also weigh decisively in Chubb Ltd.'s favor.  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) ("[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors.").

### 1.    AYS Will Not Suffer Irreparable Harm

AYS must show that it faces an injury that is "both certain and great." *Clevinger*, 134 F.4th at 1234.  Here, AYS argues that its inability to force Chubb Ltd. to distribute AYS's proposal somehow amounts to irreparable harm.  It does not, for several reasons.

*First*, AYS suffers no harm from the proper application of the SEC's Rules.  If AYS has no lawful right to have its proposal included in Chubb Ltd.'s proxy statement, then it suffers no cognizable harm from the proposal's exclusion.  "[T]he ability for a single shareholder . . . to *require* a company to include his or her own proposal in the company's proxy statement is not a fundamental right."[17]  As a former SEC Commissioner aptly distilled the point when explaining the purpose of the exclusions in SEC Rule 14a-8:  "While we all have a right to get on our soapboxes, we have no right to force others to pay for them." *Id.*

No District of D.C. precedent holds otherwise.  AYS points to non-binding, out-of-circuit authority to argue that exclusion of its proposal is, *ipso facto*, proof of irreparable harm.  R. 6-1 (Mem. in Supp. of Mot. for Prelim. Inj.) at 20 (citing *N.Y.C. Emps. Retirement Sys. v. Am. Brands, Inc.*, 634 F. Supp. 1382 (S.D.N.Y. 1986); *Amarasinghe v. Quinn*, 148 F. Supp. 2d 630, 634 (E.D. Va. 2001); *Billington v. Hayduk*, 439 F. Supp. 971 (S.D.N.Y. 1977)).  But that argument makes no sense if AYS has no right to have its proposal heard under the SEC rules.  And this argument fails to justify why AYS is harmed if its proposal is included in future proxy materials, rather than the ones Chubb is set to finalize in a matter of days.  The proposal does not, for instance, relate to a specific upcoming deadline that will elapse if the proposal's distribution is delayed, for instance, a proposal to replace directors in a hostile takeover-type environment.  Moreover, AYS has brought

---

[17]    SEC, Commissioner Elad L. Roisman, *Statement on Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8* (Sept. 23, 2020), available at https://www.sec.gov/newsroom/speeches-statements/roisman-14a8-2020-09-23.

climate-related proposals to Chubb Ltd. every year for the past five years running, and will likely bring one next year. There is no reason why this particular proposal, which calls for a third-party report on a matter that Chubb already analyzes on a regular basis as part of its normal business operations, and which requires neither corporate action nor any particular urgency, needs to be included in this year's proxy specifically.

And second, AYS's unexplained and unreasonable delay in moving for injunctive relief also indicates its supposed harm does not meet the high standard for irreparable injury. When a plaintiff "waited so long to request a stay or preliminary injunction . . . [it] suggests that their injuries are not certain and great" and similarly "implies a lack of irreparable harm." *Save Long Beach Island*, 2025 WL 2996157, at *5. When considering delay, "courts consider the date an action was authorized—not just when it takes effect." *Id.* at *15. As such, the D.C. Circuit has found a 44-day delay in seeking an injunction "inexcusable." *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975). This court has found that a two-month delay in bringing suit "militates against a finding of irreparable harm" because it undermines the plaintiff's claim that imminent action is required. *Myland Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000).

Here, the imminent harm AYS complains of is a product of its own making through its inexcusable delay in bringing this action. AYS is a self-professed expert in this space with experience submitting hundreds of shareholder proposals, including dozens of blocked proposals. Lin Decl. Exs. A, B. AYS thus knew exactly the dispute it was provoking when it first drafted its proposal to Chubb Ltd. and when it submitted that proposal on the eve of the submission deadline. The SEC's no-objection letter came on January 15, 2025, R. 1 (Compl.) Ex. 4, and AYS could have sued then. Had AYS done so, this case could have been briefed, argued, and decided over

41

the course of months, not days.  Instead, AYS elected delay at every stage and yet now demands urgent court intervention.  If AYS truly faced certain and great harm from the exclusion of its shareholder proposal, it would not have waited to submit its proposal and litigate its exclusion to the eleventh hour.

2.    The Balance of the Equities Weighs in Chubb Ltd.'s Favor.

AYS misstates the balance of the equities standard by focusing on the purported harm only to itself, and not at all the harm imposed on Chubb Ltd.  *See* R. 6-1 (Mem in Supp. of Mot. for Prelim. Inj.) at 20.  "To determine whether injunctive relief is appropriate, [the court] must balance the equities and hardships on both sides."  *Cobell v. Kempthorne*, 455 F.3d 301, 315 (D.C. Cir. 2006).  The harm to a defendant is particularly important where, as here, a plaintiff asks the Court to impose an affirmative injunction requiring action (not merely inaction freezing in place the status quo ante).  *See Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*, 795 F. Supp. 3d 7, 12 (D.D.C. 2025) (noting that "[a]ffirmative injunctions . . . are especially disruptive").  Even if a plaintiff puts forth harm that is "quite plausible" it should not obtain relief if the defendant faces a greater magnitude of more specific harms.  *Id.*

Chubb Ltd.'s harms are specific and significant.  As the SEC has acknowledged, printing and distributing proxy materials imposes a burden on companies, and both management and shareholders suffer an opportunity cost as well.  *See* SEC, Release No. 89964.

Chubb Ltd. also will be specifically and irreparably harmed if forced to allow its shareholders to vote on a proposal related to subrogation—a highly technical legal mechanism that is both fact and context specific.  O'Brien Decl. ¶¶8, 10–12; Mannion Decl. ¶¶ 5–15.  The decision over whether to exercise subrogation rights requires a legal analysis on a claim-by-claim basis, which depends on a host of localized and highly contingent factors.  Mannion Decl. ¶¶ 5–15.  Likewise, Chubb Ltd.'s business as an insurer requires management—not its shareholders—to

assess and manage risk.  AYS's proposal would conscript the shareholder-proposal process to override management's judgment about when and how to invoke subrogation in particular cases. Interference with Chubb's management's decisions with respect to how to assess and manage either subrogation or climate-impacted risk threatens to interfere with management's day-to-day operation of the company and could impose added costs on policyholders.  O'Brien Decl. ¶ 10–12; Mannion Decl. ¶¶ 14–15.

Unplanned delays in mailing the annual meeting materials could have the effect of delaying Chubb Ltd.'s annual general meeting and votes on all agenda items, including the following critical items that Swiss law reserves for shareholder approval:  (i) its annual dividend (which would result in a delay in the payment of Chubb Ltd.'s May quarterly dividend, thus harming each of Chubb Ltd.'s shareholders considering the time value of money); (ii) director compensation (which would require Chubb Ltd. to pay compensation subject to and contingent on future shareholder approval, and claw back from directors any amounts not eventually approved); and (iii) a renewed capital band, which would prevent Chubb Ltd. from having the ability to raise equity quickly in a stress scenario or if there was a merger or acquisition deal pending.  If the annual general meeting date were delayed beyond June 30, 2026, Swiss law would consider the terms of Chubb Ltd.'s directors automatically lapsed, leaving the organization without leadership oversight, and the ability to take any action at the Board level.  Froud Decl. ¶ 21.

Given the magnitude of the harm the requested injunction would cause Chubb Ltd. compared to the non-existent or *de minimis* harm to AYS, the balance of equities favors denial of injunctive relief.  *See Cobell*, 455 F.3d at 315 (denying injunctive relief when Plaintiff's "concerns, though quite plausible, lack the specificity needed to justify injunctive relief, especially given the magnitude of the harm that th[e] injunction would cause [the defendant]").

43

       3.      An Injunction Would Not Serve the Public Interest.

The public interest favors enforcing policy judgments made by the SEC that shareholders should not be permitted to advance proposals concerning operational business decisions. *See Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 68, 77 (D.D.C. 2008) (quoting *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). Pursuant to Congress's statutory prescriptions, the SEC identified the "principal consideration" in applying the Rule 14a-8(i)(7) exclusion: "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting." SEC Release No. 34-40018, at 29,108.

AYS's proposal runs contrary to this principal consideration. Granting AYS an injunction would interfere with ordinary business operations and micromanage corporate affairs under the guise of "significant social polic[ies]" by merely couching their operational judgments in policy concerns. *Id.* This does not serve the public interest. AYS's arguments to the contrary about facilitating corporate democracy ignore Congress and the SEC's deliberate choice to impose limits on shareholder proposals that shareholders are ill-equipped to decide. *See id.* ("Certain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight.").

## IV.    If an Injunction is Imposed, AYS Should Be Required to Post a Bond.

Rule 65(c) authorizes the court to issue an injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[I]njunction bonds are generally required." *Nat'l Treasury Emps.*, 2025 WL 1441563, at *3 n.4. The bond requirement protects the enjoined party from bearing costs and damages if the injunction is later found to have been wrongfully issued. *See Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.D.C.

44

1992). Sizeable bonds are appropriate where an injunction is likely to impose financial burdens on the affected party. *See, e.g.*, *Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 52 (D.D.C. 2013) (setting $250,000 bond in relation to the economic impact on the enjoined party); *see also Team Rubicon Glob. Ltd. v. Team Rubicon, Inc.*, 2020 WL 3127877, at *3 (S.D.N.Y. June 12, 2020) (ordering a $1,000,000 bond, which estimated the enjoined party's potential loss in revenue).

The court should require a bond here in the amount of an amount of no less than $250,000, and up $1.055 million in the event the timing of the injunction does not permit finalization of the proxy materials by April 6. That figure represents just a portion of Chubb Ltd.'s costs as a result of AYS's proposal, including its costs for printing and distribution of the proxy materials if delayed after April 6, which may result through unexpected complications in last-minute finalization of the materials, even if the Court rules on the preliminary injunction quickly. *See* Froud Decl. ¶ 20. This requested security is appropriately and narrowly tailored to cover Chubb Ltd.'s concrete harms from adding an additional proposal so close to the deadline.

## CONCLUSION

For the foregoing reasons, Chubb Ltd.'s Motion to Dismiss should be granted, and Plaintiff's Motion for Preliminary Injunction should be denied.

45

Dated: New York, New York
      March 19, 2026

SIMPSON THACHER & BARTLETT LLP

By: /s/ *Jonathan K. Youngwood*
Jonathan K. Youngwood (Bar No. NY0424)
Laura K. Lin (*pro hac vice* motion pending*)*
425 Lexington Avenue
New York, NY 10017-3954
Telephone: (212) 455-2421
Facsimile: (212) 455-2502
Email: jyoungwood@stblaw.com
      laura.lin@stblaw.com


O'MELVENY & MYERS LLP

By: /s/ *Allen W. Burton*
Allen W. Burton (*pro hac vice* motion pending)
Allessandra Rose Johnson (*pro hac vice* motion pending)
Elizabeth Marley (*pro hac vice* motion pending)
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Phone: (212) 326-2000
Fax: (212) 326-2061
Email: aburton@omm.com
      ajohnson@omm.com
      emarley@omm.com

*Attorneys for Defendant Chubb Limited*